Case 1:24-cv-21825-JB   Document 1-2   Entered on FLSD Docket 05/10/2024   Page 1 of 65

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT

IN AND FOR MIAMI-DADE COUNTY, FLORIDA

MARIA INVESTMENTS, INC.,          CASE NO.:

a Florida corporation,

      Plaintiff,

vs.

BEST BUY STORES, L.P.,

a Virginia limited partnership,

      Defendant.

_____/

## COMPLAINT

Plaintiff, Maria Investments, Inc., a Florida corporation, sues Defendant, Best Buy Stores, L.P., a Virginia limited partnership, and alleges:

## JURISDICTION, PARTIES AND VENUE

1. This is an action for damages which exceed $50,000.00, exclusive of interest, attorneys' fees and costs.

2. Plaintiff, Maria Investments, Inc. ("Landlord") is a Florida corporation with its Principal place of business in Miami-Dade County, Florida.

3. Defendant, Best Buy Stores, L.P. ("Tenant") is a Virginia limited partnership doing business in Miami-Dade County, Florida.

4. Venue is proper in Miami-Dade County, Florida because the cause of action arose

in Miami-Dade County, Florida and the real property which is the subject of this litigation is located in Miami-Dade County, Florida.

5.     All conditions precedent to the filing of this action have been performed, or have been waived or otherwise excused by Tenant.

6.     Landlord has retained the undersigned law firm to represent it in this action and has agreed to pay reasonable attorneys' fees for the professional services.

## COUNT I - BREACH OF CONTRACT

7.     Landlord realleges and incorporates by reference the allegations in paragraphs 1 through 6 as if fully set forth herein.

8.     On or about June 6, 2007, Landlord and Tenant entered into a contract whereby Landlord leased the real property located at Suniland Plaza, 11941 South Dixie Highway, Pinecrest, Florida to Tenant, attached hereto as Exhibit 1, which was amended on or about May 7, 2008 by the Memorandum of Lease Agreement, attached hereto as Exhibit 2 (collectively, the "Lease").

9.     Tenant breached the Lease in the following ways:

(A)   By failing to maintain the property subject to the Lease, including the building, the building service equipment and all other improvements, in good, clean, and safe condition, including by making necessary repairs and replacements;

(B)   By failing to remove personal property furnished or installed by Tenant and repair any damage the removal caused;

(C)   By making interior, structural changes, alterations, additions or improvements to the building without Landlord's consent;

2

(D)   By failing to repair any damage to any portion of the building caused by Tenant's installation, use or removal satellite equipment; and

(E)   By failing to deliver and surrender possession of the Premises in condition and repair equal to the condition and repair thereof at the commencement of the Lease Term.

10.     As a consequence of Tenant's breaches of the Lease, Landlord has been damaged.

WHEREFORE, Plaintiff, Maria Investments, Inc., requests that this Court enter final judgment on its behalf against Defendant, Best Buy Stores, L.P., for damages, prejudgment interest, costs, attorneys' fees pursuant to Section 34 of the Lease, and any such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, Maria Investments, Inc., hereby demands a jury trial on all issues so triable as of right.

Dated:  April 12, 2024

KATZMAN WASSERMAN
BENNARDINI & RUBINSTEIN, P.A.
*Counsel for Plaintiff*
7900 Glades Road, Suite 140
Boca Raton, Florida 33434
Tel.:  (561) 477-7774
Fax:  (561) 477-7447

By: _____
STEVEN M. KATZMAN, ESQ.
Florida Bar No.: 375861
smk@kwblaw.com
mrm@kwblaw.com
JASON R. KATZMAN, ESQ.
Florida Bar No.: 1003026
jkatzman@kwblaw.com

3

Best Buy # 1503
Lease Type: SC

# LEASE

by and between

## MARIA INVESTMENTS, INC.,
a Florida corporation

("Landlord")

and

## BEST BUY STORES, L.P.,
a Virginia limited partnership

("Tenant")

for improved real property located

Suniland Plaza
11941 S. Dixie Highway
Pinecrest, FL

MP2 15330024.11


EXHIBIT
1

## TABLE OF CONTENTS

**Article**                                                                                                    **Page**

I.   FUNDAMENTAL LEASE TERMS. ......................................................................................1
1.   THE PREMISES. ...........................................................................................................4
2.   TITLE AND QUIET POSSESSION. ..............................................................................4
3.   LEASE TERM. ...............................................................................................................4
4.   OPTION TO EXTEND. ..................................................................................................4
5.   CONDITION AND DELIVERY OF THE PREMISES; TENANT ALLOWANCE. ...........5
6.   RIGHT OF PRIOR ENTRY. ..........................................................................................5
7.   RENT. ..............................................................................................................................8
8.   CONFORMITY WITH LAW. .........................................................................................8
9.   UTILITIES FOR THE PREMISES. ................................................................................9
10.  REPAIRS. ........................................................................................................................9
11.  ACCESS BY LANDLORD. .............................................................................................9
12.  TENANT'S TRADE FIXTURES AND SIGNS. ............................................................10
13.  ALTERATIONS TO THE PREMISES; SATELLITE EQUIPMENT. ..........................11
14.  SURRENDER OF THE PREMISES. .............................................................................11
15.  HOLDING OVER; RIGHT OF FIRST REFUSAL. .......................................................12
16.  DEFAULT; DISPUTES. ................................................................................................12
17.  NONWAIVER OF DEFAULT. ......................................................................................15
18.  QUIET ENJOYMENT. ..................................................................................................15
19.  DAMAGE BY FIRE OR CASUALTY. ...........................................................................16
20.  WAIVER OF SUBROGATION. .....................................................................................18
21.  EMINENT DOMAIN. ....................................................................................................18
22.  INSURANCE. .................................................................................................................19
23.  SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT. ............................19
24.  TRANSFER OF INTEREST. ..........................................................................................21
25.  REAL ESTATE TAXES. ................................................................................................23
26.  RIGHT OF PROTEST. ...................................................................................................25
27.  INTENTIONALLY DELETED. ......................................................................................26
28.  ALTERATIONS TO SHOPPING CENTER. ..................................................................26
29.  GO DARK AND RECAPTURE. .....................................................................................26
30.  USE. ................................................................................................................................27
31.  HAZARDOUS SUBSTANCES. .....................................................................................28
32.  ESTOPPEL CERTIFICATE. ..........................................................................................29
33.  PARKING. ......................................................................................................................29
34.  ATTORNEY'S FEES. .....................................................................................................29
35.  BROKERAGE. ................................................................................................................29
36.  NOTICES. .......................................................................................................................30
37.  MISCELLANEOUS. .......................................................................................................30
II.  EXHIBITS. .....................................................................................................................33

## EXHIBITS

A, A-1 LEGAL DESCRIPTION OF PREMISES AND SHOPPING CENTER
B.     SITE PLAN
C.     PERMITTED TITLE EXCEPTIONS (TITLE COMMITMENT/POLICY)
D.     ELEVATIONS; STOREFRONT PYLON AND/OR MONUMENT SIGNAGE
E.     SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT
F.     MEMORANDUM OF LEASE AGREEMENT
G.     PROHIBITED USES
H.     TENANT'S INDEMNIFICATION
I.     LETTER FROM VILLAGE OF PINECREST

MP2 15330024.11

Best Buy # 1503

# LEASE

THIS LEASE ("Lease") is made and entered into as of the ___6th___ day of ~~May~~ June, 2007, by and between MARIA INVESTMENTS, INC., a Florida corporation ("Landlord"), and BEST BUY STORES, L.P., a Virginia limited partnership ("Tenant").

## WITNESSETH:

In consideration of the rents reserved and the covenants and conditions set forth herein, Landlord and Tenant agree as follows:

## I.    FUNDAMENTAL LEASE TERMS.

### A.    Parties.

Landlord:    Maria Investments, Inc.
Tenant:      Best Buy Stores, L.P.

### B.    Definitions.

"Building" shall mean the two story building containing approximately 40,000 square feet of floor area constructed on the Land. The Building, after completion of Tenant's Work (hereafter defined), is outlined in green on the site plan attached hereto as Exhibit B. For purposes of this Lease, Landlord and Tenant agree that the floor area of the Building contains 40,000 square feet and shall not be subject to remeasuring.

"Improvements" shall mean all improvements now or hereafter erected on the Land, including the Building and parking lot improvements.

"Land" shall mean the parcel of real property owned by Landlord legally described on Exhibit A attached hereto.

"Premises" shall mean the Land together with all Improvements now or hereafter erected thereon. The Premises is outlined in yellow on the site plan attached hereto as Exhibit B and made a part hereof.

"Building Permit" shall mean the building permit and other governmental approvals required for the performance of Tenant's Work.

"Common Areas" shall mean all exterior facilities furnished in the Shopping Center and designated for the general use, in common, of occupants of the Shopping Center, including Tenant, its officers, agents, employees and customers,

1

MP2 15330024.11

including, but not limited to, parking areas, streets, sidewalks, roadways, ramps, landscaped areas and other similar facilities.

"Shopping Center" means the community shopping center project known as "Suniland Plaza" legally described on <u>Exhibit A-1</u> attached hereto. The Shopping Center is outlined in red on the site plan attached hereto as <u>Exhibit B</u> and made a part hereof; provided that in the event of any conflict between <u>Exhibit A-1</u> and <u>Exhibit B</u>, <u>Exhibit B</u> shall control. Tenant acknowledges that the Premises is the only portion of the Shopping Center owned by Landlord as of the date hereof.

"Tenant's Plans" shall mean the signed and sealed set of final plans and specifications prepared by Tenant's architect for the construction and completion of the Improvements.

"Tenant's Work" shall mean all work required to be performed by Tenant to construct and complete the Improvements in substantial accordance with the Tenant's Plans.

<u>Exhibit B</u> attached hereto is a site plan of the Shopping Center (hereinafter "Site Plan").

C.   <u>Term (Articles 3 and 4)</u>.

Fifteen (15) Lease Years, with four (4), five (5) Lease Year options to extend.

D.   <u>Fixed Rent (Article 7)</u>.

| <u>Lease Yr.</u> | <u>Monthly</u> | <u>Annual</u> | <u>Per sq. ft.</u> |
|---|---|---|---|
| 1-5 | $101,666.67 | $1,220,000.04 | $30.50 |
| 6-10 | $111,833.33 | $1,341,999.96 | $33.55 |
| 11-15 | $123,000.00 | $1,476,000.00 | $36.90 |
| Opt. 1 (16-20) | $135,333.33 | $1,623,999.96 | $40.60 |
| Opt. 2 (21-25) | $148,833.33 | $1,785,999.96 | $44.65 |
| Opt. 3 (26-30) | $163,666.67 | $1,964,000.04 | $49.10 |
| Opt. 4 (31-35) | $180,000.00 | $2,160,000.00 | $54.00 |

E.   <u>Delivery (Article 5)</u>.

Landlord to deliver possession of the Premises on November 30, 2007 (the "Possession Date"), in accordance with Article 5 hereof.

F.   <u>Tenant's Allowance (Article 5.2)</u>

Landlord shall provide Tenant with a cash allowance in the amount of One Million and No/100 Dollars ($1,000,000.00).

G.     Addresses (Article 36).

    (i)     If to Landlord:

Maria Investments, Inc.
11905 S. Dixie Highway
Pinecrest, FL 33156-4444
Attention: Azhar Said
Federal Tax Identification Number: 65-0917731

with a copy to:

Greenberg Traurig, P.A.
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, FL 33301
Attention: Peter L. Tunis, Esq.

    (ii)    If to Tenant:

Best Buy Stores, L.P.
7601 Penn Avenue South
Richfield, MN 55423
Attention Legal Department - Real Estate
Federal Tax Identification Number: 41-1822872

with a copy to:

Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Attention Steven A. Schumeister, Esq.

H.     **Potential Conflict.**

If any of the terms or provisions set forth in any portion of the Fundamental Lease Terms set forth above shall conflict with any of the terms or provisions of the balance of the Lease, the applicable Fundamental Lease Term shall control.

## 1.   THE PREMISES.

Subject to the terms and conditions of this Lease, Landlord leases to Tenant and Tenant rents from Landlord the Premises situated in the City of Pinecrest, County of Miami-Dade, State of Florida.

## 2.   TITLE AND QUIET POSSESSION.

Landlord hereby represents, covenants and warrants to Tenant that it has full right and authority to enter into this Lease in accordance with the terms hereof and that it has and will maintain throughout the Lease Term (subject to Landlord's transfer rights in accordance with this Lease) good title in fee simple to the Premises, free and clear of all liens, encumbrances and other exceptions other than future mortgages, matters required by law and those set forth in the current title insurance commitment or policy issued from a national title company attached hereto as Exhibit C and made a part hereof and matters created by, through or under Tenant or at the request of Tenant (the "Permitted Exceptions"). Landlord further represents, covenants and warrants that to the best of Landlord's knowledge the Permitted Exceptions do not and will not beyond a de minimis extent (i) contravene, hinder or impair any right or privilege granted Tenant in this Lease, (ii) increase Tenant's obligations, and/or (iii) result in the imposition of any cost or expense to Tenant under this Lease (except as otherwise set forth in Section 37.14) (each, a "Title Violation"). Tenant acknowledges that it has reviewed the Permitted Exceptions and that Tenant is leasing the Premises subject to the Permitted Exceptions. Landlord shall not add any encumbrance(s) affecting the Premises or make any amendments to the Permitted Exceptions which would cause a Title Violation without Tenant's prior written approval (subject to Tenant's sole discretion). In the event of a Title Violation in (A) any Permitted Exception(s), (B) any additional encumbrance or exception, or (C) any amendments to the Permitted Exceptions without Tenant's prior written approval, the terms and/or provisions of this Lease shall control over the Title Violation. If so requested by Tenant from time to time during the term of this Lease, but not more frequently than five (5) times, Landlord shall furnish Tenant with evidence of Landlord's title to the Premises. Such title may be evidenced by a copy of a policy of title insurance issued by a title insurance company licensed to do business in the state in which the Premises are located, which policy shall contain no exceptions to Landlord's interest in the Premises superior to this Lease other than the Permitted Exceptions and mortgages or deeds of trust if in accordance with the provisions of Article 23 of this Lease. Landlord shall indemnify, defend and hold Tenant harmless from all loss, damage, costs, expenses or claims arising or resulting from any breach of this representation or warranty.

## 3.   LEASE TERM.

The term of this Lease (the "Lease Term") shall be for a period of fifteen (15) "Lease Years," as that term is hereinafter defined. The Lease Term shall commence on the date (the "Commencement Date") which is the earlier of: (i) the one hundred eightieth (180th) day after the Possession Date, as define in Article 5 hereof, or (ii) the date Tenant opens for business to the public at the Premises. The Lease Term shall expire on the last day of the fifteenth (15th) consecutive "Lease Year," unless sooner terminated or extended as provided herein.

4

The term "Lease Year" as used herein shall mean a period of twelve (12) consecutive full calendar months (except for the first Lease Year, which may be longer). The first Lease Year shall commence on the Commencement Date. The first Lease Year shall expire at midnight on the second January 31 following the Commencement Date. Succeeding Lease Years shall each commence on the first (1st) day following the end of the preceding Lease Year. After the Commencement Date and within ten (10) business days after request from the other party, the parties shall jointly execute a statement specifying the Commencement Date of this Lease.

## 4.   OPTION TO EXTEND.

Provided Tenant is not in monetary default under this Lease beyond the expiration of any applicable notice and cure period as of the date Tenant exercises a renewal option, Tenant is hereby given the right to extend the Lease Term for four (4) additional periods of five (5) Lease Years per period, upon the same terms and conditions as provided in the initial Lease Term, except the fixed rent shall be as set forth in Article I.D hereof. Tenant shall exercise the right granted in the foregoing sentence by notifying Landlord in writing of its intention to exercise its option to extend the Lease Term at least two hundred seventy (270) days prior to the date of commencement of each such extension term, time being of the essence, and thereupon this Lease shall be so extended without any further document or act. If Tenant fails to notify Landlord of its exercise of any extension option hereunder as hereinabove provided, its option(s) to extend shall nevertheless remain in full force and effect for a period of fifteen (15) days after Tenant's receipt of subsequent written notice from Landlord setting forth the expiration date of this Lease and advising Tenant that notice of extension has not been received. If the Lease Term is extended pursuant to this Article 4, the definition of "Lease Term" as used in this Lease shall include any and all such extension term(s).

## 5.   CONDITION AND DELIVERY OF THE PREMISES; TENANT ALLOWANCE.

### 5.1   Condition and Delivery of the Premises.   Landlord agrees, at its sole cost and expense, to deliver the Premises to Tenant on November 30, 2007 (the "Possession Date"), time being of the essence, in "As Is" condition, except that the Premises shall be in "broom clean" condition and, to the best of Landlord's knowledge, free and clear of any and all violations of law (except those code violations that have been disclosed to Tenant by Landlord with respect to Landlord's permit for construction of a kitchen area in the Premises) and of any and all hazardous substances and materials ("Landlord's Delivery Obligations"). Subject to applicable law, Landlord may display one (1) sign on the Premises providing notice of the new retail location of Azhars Oriental Rugs, provided that such sign does not preclude Tenant's temporary signage in any way whatsoever, and provided further that such sign is removed on or before midnight on December 31, 2007. If permitted by zoning, Tenant, at its expense in accordance with applicable law, may install metal halide parking lot lighting to provide seven (7) foot candles per square foot, averaged over entire lot with an average to minimum uniformity ratio of area around the entrance to the Building shall be at seven (7) foot candles minimum. If Tenant installs the parking lot lighting specified in the foregoing sentence during the initial phase of construction, Landlord may (but is not obligated to) take the current parking lot lights provided that Landlord removes such parking lot lights from the Premises within five (5) business days of

5

Landlord's receipt of written notice from Tenant. In addition, Tenant, at its expense in accordance with applicable law, may also provide two (2) one thousand (1,000) watt metal halide flood lights on the two (2) front poles located at the front of the Building to illuminate Tenant's storefront. Landlord agrees, if permitted by applicable law, that the bases for any light posts installed by Tenant will be three (3) foot diameter concrete columns, with a two (2) foot, six (6) inch height for pole protection.

If Landlord does not deliver the Premises on the Possession Date, for any reason whatsoever, then Landlord shall pay Tenant on demand, as agreed upon and liquidated damages, Five Thousand and No/100 Dollars ($5,000.00) per day for each day beyond the Possession Date that the Premises is not delivered. Landlord and Tenant agree that the above amount is a reasonable estimate of the damages Tenant would sustain if the substantial completion of Landlord's Work is delayed, and that it is not and shall not be construed as a penalty. Tenant may, at Tenant's option, deduct the amount due from Landlord under this paragraph from the rent payments otherwise due hereunder. In addition to the foregoing rights, if Tenant shall, in the exercise of its reasonable judgment, determine that the Premises will not be delivered on the Possession Date, or that deficiencies exist therein with respect to Landlord's Delivery Obligations which must be immediately corrected, Tenant shall have no obligation to, but at any time may, upon five (5) days' prior written notice to Landlord, elect to correct such deficiencies at Landlord's cost and expense, unless Landlord shall within said five (5) day period and to the reasonable satisfaction of Tenant, either correct the situation giving rise to Tenant's determination or commence, and diligently pursue, a course of action which will permit the timely correction of the deficiency therein. Tenant shall be permitted to offset against fixed rent or other sums to be paid by Tenant under this Lease an amount equal to (A) liquidated damages as above provided, and/or (B) costs or expenses incurred by Tenant if Tenant elects to complete uncompleted or deficient items, with interest upon the remaining balance of any such liquidated damages or completion costs at a rate equal to the lesser of (y) the Prime Rate or "Reference Rate" then being published in the Wall Street Journal, plus four percent (4%) per annum, or (z) the highest rate per annum permitted by law (the "Interest Rate"), until the amount of such liquidated damages or completion costs, plus interest, is recouped in full.

5.2    **Tenant's Plans.** Within sixty (60) days from the date of this Lease, Tenant shall supply Landlord with its proposed Tenant's Plans for its renovation of the Premises, which such Tenant's Plans must be substantially in accordance with the Site Plan set forth in Exhibit B and the Building elevations set forth in Exhibit D and in such detail as to be acceptable to the governmental authorities having jurisdiction over the Premises in order for Tenant to be able to obtain its Building Permit based upon such plans and specifications. Tenant's Plans must be approved in writing by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Within five (5) business days after receipt of Tenant's Plans, Landlord shall either approve of or notify Tenant in writing of any objections it has to said plans and specifications. The failure of Landlord to disapprove of Tenant's Plans within said time period shall be deemed an approval. Landlord shall not withhold its consent to Tenant's Plans for the construction of the interior of the Building so long as the quality of the materials and finishes of the Building interior are not materially different from Tenant's other locations in South Florida. Tenant shall within fifteen (15) days of receipt of a disapproval notice submit its revised plans and specifications for Landlord's approval and the failure of Landlord to approve or disapprove

such revised plans and specifications within five (5) business days after submission of the revised plans and specifications shall be deemed an approval. Tenant's Plans shall be sealed by a Florida licensed architect. Landlord's approval of Tenant's Plans, if given, shall not imply Landlord's approval of the structural or engineering designs, or quality or fitness of any material or device used or that Tenant's Plans are in accordance with law (it being agreed that such compliance is solely Tenant's responsibility) nor shall it relieve Tenant of the responsibility of constructing structurally sound improvements free of defects nor shall such approval impose any present or future liability on Landlord to Tenant or to any third party. Tenant agrees to use good faith diligent efforts to obtain said Building Permit. Landlord agrees, at no cost to Landlord, to cooperate with Tenant and assist Tenant in obtaining the Building Permit for Tenant's Work.

**5.3  Tenant's Construction of Improvements.** Tenant agrees to pay any impact fees assessed by governmental authorities in connection with Tenant's construction of Tenant's Work. Tenant agrees to pay any water and sewer connection or tap-in fees charged by any governmental authority or by the applicable utility company solely by reason of Tenant's construction of Tenant's Work. Prior to the date hereof, Landlord or its predecessor in interest has obtained Site Plan approval of the Premises Site Plan from the Village of Pinecrest, Florida. Tenant shall cause Tenant's Work to be constructed in substantial accordance with the Tenant's Plans previously submitted to and approved by Landlord. All work to be performed by Tenant shall be performed by a contractor selected by Tenant. All Tenant's Work shall be done in a good and workmanlike manner comparable to other new Best Buy stores in South Florida.

Tenant agrees to commence construction of the Tenant's Work within thirty (30) days after the Possession Date and the date upon which the Building Permit is issued to Tenant. From and after Tenant's commencement of construction of the Tenant's Work, when and as set forth above, Tenant shall thereafter diligently prosecute such construction to completion in accordance with such Building Permit. Tenant's construction may vary from the requirements of the Tenant's Plans if the variance is required by the Building Permit or applicable legal requirements, or if the variance is not material. Upon Landlord's reasonable request, Tenant shall provide to Landlord an architect-certified report verifying conformity of Tenant's Work with the approved Tenant's Plans. Subject to force majeure, Tenant shall complete construction of the Tenant's Work not later than three hundred sixty (360) days from the later of the Possession Date and the date Tenant obtains its Building Permit ("Completion Date"). Subject to force majeure, Tenant shall open a fully fixtured, staffed and stocked Best Buy store for business to the public for a period of at least one (1) day on or before 90 days after the Completion Date. Tenant covenants that the Improvements shall comply with all applicable governmental regulations, codes and ordinances of the Village of Pinecrest, Miami-Dade County and the State of Florida. Landlord shall have no liability with respect to Tenant's materials or equipments stored in the staging area, except for the negligent or intentional acts of Landlord, its agents, contractors or employees.

Upon the written request of Tenant, Landlord shall promptly grant and enter into any easements across the Land which are reasonably necessary for the construction or operation of the Improvements, subject to the following conditions: (i) in the case of easements, such easements shall be for utility or access purposes and shall be required by the utility company or governmental agency having jurisdiction or be necessary for the construction or operation of the

Improvements; (ii) such easements when granted and utilized will not materially and adversely affect the operation of the businesses located in the Shopping Center; and (iii) the cost of preparing such easements, and the cost of constructing any improvements required in connection therewith shall be paid for by Tenant. Landlord covenants to use reasonable efforts to cause any mortgagee having an interest in the Land to join in and subordinate its interest to such easements.

     **5.4**    **Tenant Allowance.** Landlord shall pay to Tenant a cash allowance of One Million and No/100 Dollars ($1,000,000.00) ("Tenant Allowance") which shall be due and payable in full on or before twenty (20) days after the later of (i) the date Tenant opens the Premises for business to the public as a fully fixtured, staffed and stocked Best Buy store, or (ii) the date Landlord receives Tenant's indemnification against any and all mechanic's liens relative to Tenant's Work as defined herein in the form attached hereto as <u>Exhibit H</u> ("Tenant's Indemnification"); provided, however, that if Tenant is in default beyond any notice and cure period, Landlord shall not be obligated to pay the Tenant Allowance until Tenant has cured such default. If Tenant is not in default and the Tenant Allowance is not paid in full within ten (10) days after the date due, interest (compounded) shall accrue on the Tenant Allowance at the Interest Rate, and shall continue until the entire amount, both principal and interest, is paid in full. In the event that the Tenant Allowance due hereunder is not paid when due as set forth herein, Tenant shall be entitled to all remedies available at law or equity and all remedies set forth in this Lease if such failure shall continue for more than thirty (30) days. If such failure shall continue for more than thirty (30) days, Tenant may offset and deduct such amounts against fixed rent or other sums to be paid by Tenant under this Lease.

**6.**    **RIGHT OF PRIOR ENTRY.**

At any time prior to the Possession Date, upon reasonable advance notice to Landlord, Tenant shall have the right to enter the Premises for the purposes of measuring and inspecting the Premises. Any entry by Tenant for the purpose of measuring or inspecting the Premises shall not interfere with Landlord's business operation in the Premises and shall not be deemed acceptance of the Premises by Tenant.

**7.**    **RENT.**

Tenant agrees to pay Landlord as monthly fixed rent for the Premises during the Lease Term the sums set forth in Article I.D. hereof. Such monthly fixed rent shall be paid in advance and without demand without deduction or set-off except as otherwise expressly provided herein on the first day of every calendar month commencing on the Commencement Date and thereafter during the Lease Term. Fixed rent and other charges otherwise payable hereunder (collectively "Rent") shall be prorated for any partial month at the beginning or end of the Lease Term. Tenant shall pay Rent to Landlord at the address provided for Landlord in Article G hereof, unless otherwise notified in writing by Landlord. No fixed rent or other charges shall be payable if the Tenant Allowance is due and unpaid; provided, however, such rent and charges shall accrue and be payable upon Landlord's payment of the Tenant Allowance.

Tenant shall also pay with each fixed rent and other payment hereunder any sales taxes or similar excise taxes now or hereafter imposed upon or with respect to the Rent and all other payments

payable hereunder, even though the taxing statute or ordinance may purport to impose same against Landlord.

## 8.   CONFORMITY WITH LAW.

Tenant will use and occupy the Premises and appurtenances in a careful, safe and proper manner, and shall comply with the applicable laws regarding the conduct of Tenant's business. Tenant agrees, at its expense, to comply with all provisions of any and all statutes, ordinances, regulations and special permits imposed by 'the State of Florida, the federal government, the County of Miami-Dade, the Village of Pinecrest and/or of any other governmental agency now or hereafter in force relating to the structure, maintenance, operation, use and occupancy of the Premises and Tenant agrees that, in the event of noncompliance or contest, to indemnify and save harmless Landlord from any and all demands, actions, penalties or claims of any nature whatsoever, including reasonable attorneys' fees expended by Landlord which may arise by reason of or in connection with Tenant's failure to so comply. Tenant acknowledges and agrees that no portion of the Premises shall be used in violation of the "Prohibited Uses" as set forth in Exhibit G attached hereto and made a part hereof. Tenant will not permit the Premises to be used for any unlawful purpose. Landlord hereby warrants that to the best of Landlord's knowledge, at the time of delivery of the Premises to Tenant, the Premises will be in conformance with all applicable laws (except those code violations that have been disclosed to Tenant by Landlord with respect to Landlord's permit for construction of a kitchen area in the Premises).

## 9.   UTILITIES FOR THE PREMISES.

Tenant shall pay when due all bills for gas (if any), water, electricity and other utilities used on the Premises on and after the Possession Date and through and including the date of expiration of this Lease or the earlier termination hereof. All such utilities are separately metered to the Premises. As of the Possession Date, service for all such utilities shall be put in Tenant's name. Landlord shall not be liable to Tenant for any interruption of utility services to the Premises caused by events beyond Landlord's reasonable control.

## 10.   REPAIRS.

Tenant consents and agrees at its expense to maintain, repair and replace if replacement is necessary the Building, building service equipment (including, without limitation, all utility systems and the HVAC system) and all other improvements now or at any time hereafter located on the Land in good, clean, safe, sightly order and condition, ordinary wear and tear excepted. Tenant shall, at its expense, make all internal repairs, replacements, additions, improvements, alterations or changes of every type, kind and nature as shall or may be necessary or appropriate to make the Premises suitable and to keep the Premises in good condition, ordinary wear and tear excepted, and any and all external repairs, replacements and maintenance to the Common Areas, paving, striping, lighting, pylon sign, landscaping, painting, roof, walls, doors, windows and signs thereon. Tenant shall make all such repairs whether ordinary or extraordinary and whether or not structural. All such work shall be done in a good and workmanlike manner, and when completed, be free and clear of all claims for liens by mechanics or materialmen for and on

9

account of labor and material furnished in and about such operations. Landlord shall have no obligation to do or make any maintenance, repair or replacement to the Premises, the Building, or any other improvement thereon, except if same is necessary because of the act, neglect or default of Landlord or its agents, employees or contractors. Subject to the notice and cure period provisions of Article 16 hereof, should Tenant after notice from Landlord fail to commence with reasonable promptness and diligently pursue to completion any repairs which are the obligation of Tenant hereunder, Landlord may (but shall not be obligated to) enter the Premises and put the same in good order, condition and repair; the reasonable cost thereof shall become due and payable by Tenant to Landlord upon written demand.

## 11.   ACCESS BY LANDLORD.

Landlord shall have access to the Premises (accompanied by an employee of Tenant during non-business hours or for any non-public area) at all reasonable times upon twenty-four (24) hours' written notice for the purpose of examining or making any repairs thereto that Landlord is required or permitted to make under this Lease or which are necessary for safety or maintenance purposes. In the event of an emergency, Landlord shall not be required to give Tenant twenty-four (24) hours' written notice, but shall use reasonable efforts to notify Tenant and its security company prior to entry. Tenant agrees that Landlord shall have access to the Premises (accompanied by an employee of Tenant during non-business hours or for any non-public area) to show the Premises to actual or prospective purchasers, lenders and during the last six (6) months prior to the expiration of the then current term (original or extended) to prospective tenants if this Lease has not been renewed.

## 12.   TENANT'S TRADE FIXTURES AND SIGNS.

Landlord shall permit Tenant to construct, in accordance with applicable law Tenant's Plans attached hereto as Exhibit D, Tenant's standard storefront structure, including building design and height, for Tenant's installation, at Tenant's sole cost and expense, of Tenant's standard yellow-and-black ticket sign tilted five (5) degrees, with dimensions not less than 25'3" x 15'6" thereon. Tenant may also install and maintain in the Building such pipes, conduits and ventilating ducts as are required or desirable for Tenant's business. Tenant shall at all times have the right to remove all signs, trade fixtures, machinery, equipment, or other personal property heretofore or hereafter furnished or installed by Tenant, provided it repairs any damage caused thereby, it being expressly understood and agreed by the parties that such property shall not become part of the Building but shall at all times be and remain the property of Tenant and as such shall not be subject to any landlord's lien or other claim of Landlord.

Tenant shall obtain any municipal and/or city approvals necessary for Tenant's signage as described herein. Landlord, at its sole cost and expense, shall grant to Tenant all space on any pylon, free-standing, and/or monument signs formerly occupied by Azhars Oriental Rugs for Tenants' installation of its standard pylon sign panel with Tenant's standard yellow-and-black tilted ticket as depicted on Exhibit D attached hereto. In addition, Tenant, at its expense and in accordance with applicable law, may construct such other monument and/or pylon signs in the Common Area of the Premises in a place to be designated by Tenant for Tenant's sole and exclusive use.

10

MP2 15330024.11

Tenant at its expense may place on the interior and exterior of the Building any signs, machinery and other mechanical equipment which conform to applicable legal requirements. Tenant shall have the right, at its sole cost and expense and in accordance with applicable law, to install its standard prototype signage on the sides and rear of the Building as depicted in Exhibit D.

Tenant shall have the right in accordance with applicable law to designate the colors and design for all of its signs on or for the Premises, including panels on any pylon or freestanding sign(s) to which Tenant is allowed space or Tenant's storefront signage and structure.

Landlord shall have no right to place or maintain any signs of any type, other than those of Tenant, on the Premises, including the exterior walls and roof thereof.

## 13.    ALTERATIONS TO THE PREMISES; SATELLITE EQUIPMENT.

Tenant at its own cost and expense and without Landlord's consent may make interior non-structural changes, alterations, additions and improvements to the Building. If so requested by Tenant, Landlord shall cooperate in securing necessary permits and other government authorizations for Tenant's changes and alterations, at no cost to Landlord. Landlord and Tenant shall agree on a location where Tenant may install a dumpster and/or storage container for construction materials during the performance of Tenant alterations permitted hereunder which location shall be reasonably close to the Building without unreasonably interfering with other business operations at the Shopping Center.

Landlord agrees that at any time following the Possession Date, and during the Lease Term Tenant shall have the right, at its expense, to install a satellite communications and receiving dish and related sled, and any other related materials, equipment or components thereof, including, but not limited to, any cabling or wiring through the Building (collectively, the "Satellite Equipment") on the roof of the Building. In addition, Tenant shall be entitled to continuing access to perform any installation, maintenance, repairs and replacements of the Satellite Equipment that Tenant deems necessary, in Tenant's sole and absolute discretion. Further, Landlord agrees and acknowledges that the foregoing are material inducements to Tenant to enter into this Lease. Tenant shall be responsible for the repair of any damage to any portion of the Building caused by Tenant's installation, use or removal of the Satellite Equipment. The Satellite Equipment shall remain the exclusive property of Tenant, and Tenant shall have the right to remove same at any time during the term of the Lease. Tenant shall protect, defend, indemnify and hold harmless Landlord from and against any and all claims, damages, liabilities, costs or expenses of every kind and nature (including without limitation reasonable attorneys' fees) imposed upon or incurred by or asserted against Landlord arising out of Tenant's installation, maintenance, use or removal of the Satellite Equipment. The Satellite Equipment shall be used only in connection with the operation of the business of the occupant of the Building and not for use by unrelated third parties.

## 14.    SURRENDER OF THE PREMISES.

Tenant will deliver and surrender possession of the Premises to Landlord upon the expiration of the Lease Term or earlier termination of this Lease, in condition and repair equal to the condition and repair thereof at the commencement of the Lease Term, loss by fire, ordinary wear and tear and decay, casualty (to the extent that Tenant has no restoration obligation), neglect or fault or default of Landlord, and taking by eminent domain (to the extent that Tenant has no restoration obligation), excepted. Landlord expressly waives any statutory or other lien or security interest in Tenant's property.

## 15. HOLDING OVER; RIGHT OF FIRST REFUSAL.

If Tenant occupies the Premises after the expiration of the Lease Term or any extension thereof (or any earlier termination provided or permitted by this Lease) without the written consent of Landlord, such tenancy shall, at Landlord's option, be month-to-month only at one hundred twenty-five percent (125%) of the fixed rent and at the same additional rent payable for the last month of the Lease Term (and not year-to-year or based on any other interval of time). Such continued occupancy shall not defeat Landlord's right to possession of the Premises, and the month-to-month tenancy provided for herein may be canceled at the end of any calendar month upon not less than thirty (30) days' prior written notice from Landlord to Tenant. Except for provisions relating to Lease Term or any extension thereof, all covenants, provisions, obligations and conditions of this Lease shall remain in full force and effect during such month-to-month tenancy.

Tenant shall have a right of first refusal to lease the Premises for an additional term after expiration of the Lease Term and all extensions provided for herein upon the same terms and conditions of any bona fide offer to lease ("Offer to Lease") made and acceptable to Landlord. Landlord shall notify Tenant of any such Offer to Lease by delivering to Tenant a copy thereof certified by Landlord to be true, correct and complete, and thereafter Tenant shall have fifteen (15) days within which to exercise the right of first refusal granted hereunder by accepting the terms of the Offer to Lease in a writing delivered to Landlord.

## 16. DEFAULT; DISPUTES.

    **16.1 Tenant Default.** If any of the following (hereinafter referred to as an "Event of Default") shall occur:

    (a)    Tenant shall at any time be in default of the payment of Rent, and Tenant shall fail to remedy such default within ten (10) days after receipt of written notice of such default from Landlord; or

    (b)    Tenant shall at any time be in default of the performance of any of its obligations under this Lease other than payment of Rent, and shall fail to remedy such default within thirty (30) days after receipt of written notice of such default from Landlord, provided, however, that Tenant shall not be deemed in default if such default cannot be cured within such thirty (30) day period and Tenant commences curing such default within such thirty (30) day period and thereafter diligently pursues such cure to completion; or

12

      (c)      Tenant shall make an assignment for the benefit of creditors or a petition is filed by or against Tenant under the United States Bankruptcy Code and such petition is not dismissed or stayed within ninety (90) days; or

      (d)      the appointment of a receiver of any property of Tenant in the Premises in any action, suit or proceeding by or against Tenant and not removed within ninety (90) days after appointment,

then, upon the occurrence of such Event of Default and the termination of the applicable notice period hereinabove provided without cure, Landlord may without further notice or demand enter into the Premises and take possession thereof, without such reentry causing a forfeiture of the Rent to be paid or the covenants to be performed by Tenant hereunder for the full Lease Term, and upon such reentry Landlord may lease or sublease the Premises for such Rent as Landlord may reasonably obtain, crediting Tenant with the Rent so obtained after deducting the costs Landlord reasonably incurs by such reentry, leasing or subleasing; or in the alternative, Landlord may terminate this Lease and reenter and take possession of the Premises, releasing Tenant from further obligation hereunder and free from any further right or claim by Tenant.

No such reentry or taking possession of the Premises by Landlord shall be construed as an election on Landlord's part to terminate this Lease, unless a written notice of such intention to terminate this Lease is given to Tenant or unless termination hereof is decreed by a court of competent jurisdiction. Notwithstanding any such reentry or taking of possession, Landlord may, at any time thereafter, elect to terminate this Lease for any previous Event of Default. In the event that Landlord repossesses the Premises due to an Event of Default, Tenant shall (i) remain liable for all Rent and other obligations accruing up to the date of such repossession or termination, and (ii) be liable to Landlord for all costs incurred in connection with the repossession and reletting of the Premises (including, without limitation, reasonable attorney and brokerage fees (which brokerage fees shall be amortized over the initial term of the new tenant's lease (which shall be not less then ten (10) years), and Tenant shall be liable for only the portion thereof allocable to the remainder of the then existing term of this Lease) and any costs in connection with necessary repairs or remodeling to render the Premises suitable for reletting, but specifically excluding costs of or allowance for altering, remodeling or refurbishing the Premises for use and/or occupancy by any subsequent tenant or occupant, and (iii) remain liable for the payment of all of the fixed rent and additional rent payable hereunder for the balance of the unexpired term of this Lease in effect as of the date of repossession by Landlord. Any rental which may be due Landlord, as herein provided, shall include the monthly rent and any other costs and expenses denominated as additional rentals in this Lease. Landlord may bring suits for such amounts or portions thereof, at any time or times as the same accrue or after the same have accrued, and no suit or recovery of any portion due hereunder shall be deemed a waiver of Landlord's right to collect all amounts to which Landlord is entitled hereunder, nor shall the same serve as any defense to any subsequent suit brought for any amount not theretofore reduced to judgment. In the event the Premises are relet by Landlord, Tenant shall be entitled to a credit against its rental obligations hereunder in the amount of Rent received by Landlord from any such reletting of the Premises less any reasonable costs incurred by Landlord (not previously reimbursed by Tenant) in connection with the repossession and reletting of the Premises

(including, without limitation, reasonable attorneys' fees, brokerage commissions (which brokerage fees shall be amortized over the initial term of the new tenant's lease (which shall be not less then ten (10) years), and Tenant shall be liable for only the portion thereof allocable to the remainder of the then existing term of this Lease), and any cost of repairs, alterations and improvements to the Premises. Landlord may relet the Premises for a term or terms which may, at Landlord's option, be equal to or less than or exceed the period which would otherwise have constituted the balance of the term of this Lease, as reasonably determined by Landlord. Landlord may grant commercially reasonable concessions and free rent as Landlord deems necessary in connection with any such reletting. Landlord must use reasonable efforts to relet the Premises. In such event, the listing of the Premises with a commercial real estate broker designated by Landlord on reasonable terms and conditions shall be deemed to be reasonable efforts to relet the Premises. Landlord shall not, in any event, be required to pay Tenant any surplus of any sums received by Landlord on a reletting of the Premises in excess of the Rent provided in this Lease, but such excess will reduce any accrued present or future obligations of Tenant hereunder. Subject to the notice and cure periods provided herein, Landlord shall have the right to exercise any and all other remedies available to Landlord, in connection with an Event of Default, at law or in equity, including, without limitation, injunctive relief.

If Tenant fails to make any payment or perform any agreement or obligation on its part to be performed under this Lease, Landlord, in addition to all other remedies available to Landlord, shall have the right (but not the obligation) (i) if no emergency exists, to pay and/or perform the same after giving thirty (30) days' notice to Tenant (10 days' notice in the case of a monetary default) or such longer time as may be reasonably required because of the nature of the non-monetary default provided Tenant has commenced to cure within such thirty (30) day period and thereafter diligently pursues such cure to completion; and (ii) in any emergency situation (i.e., a situation imposing imminent danger to persons or property), to perform the same immediately without notice or delay. For the purpose of rectifying Tenant's defaults as aforesaid, Landlord shall have the right to enter the Premises. Tenant shall, within ten (10) days after written demand, reimburse Landlord as additional rent for the actual costs and expenses incurred by Landlord in rectifying Tenant's defaults as aforesaid together with an administrative charge equal to ten percent (10%) of the amount of such costs and expenses. Except for the negligence by Landlord or Landlord's agents, employees, licensees or invitees, Landlord shall not be liable or in any way responsible for any loss, inconvenience, annoyance, or damage resulting to Tenant or anyone holding under Tenant for any action taken by Landlord pursuant to this Section. Any act or thing done by Landlord pursuant to this Section shall not constitute a waiver of any such default by Tenant or a waiver of any covenant, term or condition herein contained or the performance thereof.

      **16.2   Landlord Default.** A "Landlord Default" shall be deemed to exist if (i) Landlord defaults in the performance of any of its monetary obligations under this Lease and fails to cure such default within ten (10) days after Landlord's receipt of written notice of such default, or (ii) Landlord defaults in the performance of any of its non-monetary obligations under this Lease and fails to cure such default, or to commence and diligently pursue the completion thereof, within thirty (30) days after Landlord's receipt of written notice of such default. Subject to remedies for Landlord Default, if any, set forth in other Articles of this Lease and in addition to any other remedies available in law or in equity, if a Landlord Default shall exist, Tenant may proceed to

14

cure such default and bill Landlord for the reasonable cost thereof together with an administrative fee equal to ten percent (10%) of such costs, and then if Landlord has not reimbursed Tenant such amount within thirty (30) days after its receipt of Tenant's bill, then Tenant may offset against Rents payable hereunder, the costs and expenses incurred by Tenant to cure such Landlord Default, together with an administrative charge equal to ten percent (10%) of the amount of such costs and expenses.

**16.3    Disputes.**  In the event of a bona fide dispute between Landlord and Tenant arising under Articles 10, 22 or 25 of this Lease or with respect to this Lease (specifically excluding any dispute where the monetary amount in question is expressly provided for under this Lease including, without limitation, fixed rent or liquidated damages, and/or with respect to the collection of Tenant's Allowance pursuant to Article 5), either party ("Disputing Party") shall have the right, within the applicable notice and cure period, to notify the other party in writing ("Dispute Notice") of the Disputing Party's desire to dispute the propriety of the other party's claim of default.  If such dispute relates to the payment of money the Dispute Notice shall be valid only if the Disputing Party pays, within the applicable notice and cure period, that portion of the sum due as to which the Disputing Party does not dispute, limiting the dispute to the net amount actually disputed.  The Dispute Notice shall be accompanied by a detailed statement of the basis for the Disputing Party's claim.  The time within which to cure any claimed default as to which a proper Dispute Notice has been delivered shall be extended to the date which is ten (10) days after the earlier to occur of (i) the resolution of the dispute by the parties or (ii) the final determination of the forum permitted by this Lease.  Landlord shall not be entitled to commence or maintain an unlawful detainer or eviction proceeding in connection with any bona fide dispute involving Tenant's obligations under Article(s) 22, and/or 25 of this Lease.

In the event of any bona fide dispute between Tenant and Landlord under this Lease where the net amount in issue is less than Twenty-Five Thousand and No/100 Dollars ($25,000.00), Landlord and Tenant each waive its right to file a civil action or proceeding in connection with such dispute, it being agreed that upon demand by either party, the parties shall resolve the dispute by referring the same to a single arbitrator to be selected by the parties.  The arbitration shall take place in Miami, Florida and be governed under the rules of the American Arbitration Association.  The arbitrator will have access to such records of the parties as are reasonably necessary and the decision of such arbitrator will be final and binding upon the parties.  The cost of the arbitration will follow the award, unless otherwise determined by the arbitrator.

**16.4    Interest.**  If either party fails to make a payment under this Lease within ten (10) days after the due date, excluding good faith disputes under Article 16.3 above, interest shall accrue on the unpaid balance owed by that party at a rate equal to the lesser of (a) the Prime Rate or "Reference Rate" then published in the Wall Street Journal, plus four percent (4%) per annum, or (b) the highest rate per annum permitted by law (the "Interest Rate"), until the unpaid balance, plus interest at the Interest Rate, is paid in full; provided, however, on the first such occurrence in any twelve (12) month period, such interest shall be payable only if the party required to make such payment shall fail to pay the amount past due within ten (10) days after its receipt of notice of non-payment from the party to receive such payment.

**17.    NONWAIVER OF DEFAULT.**

No acquiescence by either party in any breach or default by the other party under this Lease shall operate as a waiver of the acquiescing party's rights with respect to such breach or default or any other breach or default.

## 18.   QUIET ENJOYMENT.

Landlord covenants and agrees that if Tenant shall perform all covenants and agreements herein stipulated to be performed by Tenant, then at all times during the Lease Term and any extension thereof Tenant shall have the peaceable and quiet enjoyment and possession of the Premises, without any manner of hindrance from Landlord or any other person or entity.

Landlord hereby represents and warrants to Tenant that Landlord's execution of this Lease, compliance with the terms hereof and occupation of the Premises by Tenant will not conflict with, cause a breach of or constitute a default under any agreement or instrument to which Landlord is a party.

Landlord's breach of this Article 18 shall entitle Tenant to all available equitable relief as well as any and all remedies at law, and Landlord agrees to indemnify Tenant from and against all damages, expenses and costs arising out of or resulting therefrom.

## 19.   DAMAGE BY FIRE OR CASUALTY.

If at any time during the Lease Term, the Improvements, or any part thereof, shall be damaged or destroyed by fire or other casualty (whether or not insured), then Tenant shall proceed with due diligence (subject to reasonable time allowance for the purpose of adjusting the insurance loss, obtaining the necessary building permit or unavoidable delay) to repair, replace or rebuild the Improvements either (a) as nearly as possible to its condition, character and value immediately prior to such damage or (b) to conform to a more recent prototype provided the value of the same is no less than the value immediately prior to the damage ("Restoration Work"). If the cost of completing the Restoration Work exceeds the insurance proceeds to be made available for such purpose, then Tenant shall provide the difference between the cost of the Restoration Work and the amount of available insurance proceeds. Tenant shall commence the Restoration Work within a period of one (1) month from the date Tenant shall have (i) obtained the necessary building permit, and (ii) received any insurance proceeds which are payable, and thereafter prosecute the same with such dispatch as may be necessary to complete the same within twelve (12) months after the occurrence of both such events. The twelve (12) month period provided herein for reconstruction shall be enlarged by delays caused, without fault or neglect on the part of the Tenant, by acts of God, strikes, lock-outs or other conditions (other than matters of finance), including delay in obtaining building permits, beyond the control of Tenant.

All insurance proceeds payable and received at any time, or from time to time as a result of casualty to the Improvements, shall be paid to Tenant and Landlord as a loss payee and shall be deposited with the first Mortgagee, or a bank, trust company, or title insurance company designated by Landlord and approved by Tenant (the "Insurance Trustee"), in trust, for purposes of the Restoration Work. The Insurance Trustee shall disburse the proceeds of such insurance

16

from time to time as progress payments proportioned to the percentage of completion of the Restoration Work and on such terms as may be customary for advances under institutionally financed construction loan provisions (including retainage provisions). Notwithstanding the foregoing, so long as Tenant is not in default under this Lease beyond the applicable notice and cure period and has a net worth of at least $300 million, all insurance proceeds shall be paid directly to Tenant and shall not be held by the Insurance Trustee. Except as otherwise set forth herein, upon lien free completion of the Restoration Work any excess insurance proceeds shall be payable to Tenant. If the Lease is terminated prior to completion of the Restoration Work, all of the insurance proceeds shall be returned or paid directly to Landlord. Notwithstanding the foregoing, in the event of a casualty in which the proceeds of the insurance award do not exceed $100,000.00, then such proceeds shall be paid directly to Tenant, to be applied to the Restoration Work, except as may be otherwise expressly set forth herein.

This Lease shall not be affected in any manner by reason of the total or partial destruction of the Improvements or any part thereof, for any reason whatsoever, and Tenant, notwithstanding any law or statute, present or future, waives all rights to quit or surrender the Premises or any part thereof, and Tenant's obligations under this Lease, including the payment of fixed rent and additional rent, shall continue as though none of those events had occurred and without abatement, suspension, or reduction of any kind, except as otherwise expressly provided herein. If this Lease shall be cancelled for Tenant's default at any time while there remains outstanding any obligation from Tenant or from any insurance company to pay for damage to the Improvements or any part thereof, then Tenant shall pay the insurance proceeds held by Tenant (if any) to Landlord and the claim against the insurance company shall, upon the cancellation of this Lease, be deemed immediately to become the absolute and unconditional property of Landlord.

If the Improvements shall be substantially damaged or destroyed in whole or in part in excess of 33-1/3% of the replacement cost thereof, exclusive of foundations and footings, by fire or other casualty at any time during the last two (2) years of the Lease Term or during the last two (2) years of any renewal term, then:

      (a)   Tenant may elect not to restore the Improvements and to terminate this Lease by serving upon Landlord, within thirty (30) days after the date on which such damage or destruction occurred, written notice of Tenant's election to so terminate effective not more than thirty (30) days after such notice shall have been given.

      (b)   In the event Tenant elects to terminate this Lease as aforesaid, Tenant shall pay to Landlord, prior to such termination date, an amount equal to the fixed rent and the then ascertainable additional rent payable under this Lease to the date of such termination. With respect to any items of additional rent which are payable to Landlord in the event of such termination but which are not then capable of ascertainment, Tenant shall thereafter pay to Landlord an amount equal to such additional rent as and when same become determined. The covenants and agreements with respect to the adjustment and payment of these items of additional rent and refunds, if any, shall survive the termination of this Lease.

(c)    In the event Tenant elects to terminate this Lease as aforesaid, the proceeds collected under any policy or policies of casualty insurance for damage to the Improvements shall be paid to the Landlord.

If this Lease is terminated for any reason pursuant to this Article 19, Landlord shall promptly refund to Tenant any Rent and other unearned charges paid in advance.

## 20.    WAIVER OF SUBROGATION.

Landlord and Tenant hereby waive and release all rights of subrogation which either has or which may arise hereafter against the other for any damage to the Premises or any other real or personal property damage or loss of business by any cause whatsoever for which either party may be reimbursed by insurance for any loss; provided, however, that the foregoing waivers of subrogation do not invalidate any policy of insurance of the parties hereto now or hereafter issued, it being stipulated by the parties hereto that such waiver shall not apply in any case which would result in the invalidation of any such policy of insurance. Each party shall notify the other if such party's insurance would be so invalidated.

## 21.    EMINENT DOMAIN.

If the entire Premises are at any time after execution of this Lease taken by public or quasi-public use or condemned under eminent domain, then this Lease shall terminate and expire effective the date of such taking and any Rent paid in advance and any other unearned charges shall be immediately refunded to Tenant by Landlord on such date.

Tenant may terminate this Lease and receive from Landlord an appropriate refund of Rent and/or other unearned charges paid in advance if, as a result of eminent domain proceedings or any other governmental or quasi-public action, any of the following events (each, a "Partial Taking") shall occur: (A) the pylon sign to which Tenant is entitled under Article 12 is restricted or taken and no comparable signage with exposure to South Dixie Highway is available for Tenant to relocate such pylon sign, (B) any portion of the Building is taken, (C) access area serving the Premises is taken so as to materially and adversely affect vehicular access to the Premises and no comparable substitute is provided within a reasonable time thereafter, or (D) fifteen percent (15%) or more of the parking area serving the Premises is taken and no comparable parking is provided within a reasonable time thereafter. If Tenant elects to remain in the Building after any Partial Taking, then Rent shall be reduced for the remainder of the Lease Term thereafter in proportion to the Building area taken, and reduced by an equitable amount for any non-Building area taken and Tenant, at its expense, shall, to the extent of the award (but this limitation shall not be construed as imposing any obligation on Landlord to contribute to such restoration work), proceed with diligence (subject to reasonable time periods for purposes of adjustment of any award and unavoidable delays) to repair or reconstruct the Improvements and the Building to a complete architectural unit (all such repair, reconstruction and work being referred to in this Article as "Reconstruction Work"). The award for the Reconstruction Work shall be payable and disbursed substantially in the same manner and subject to the same conditions as provided in Section 19 for the disbursement of casualty insurance proceeds and restoration. During the period in which the Reconstruction Work has not been completed, Tenant shall be entitled to an

equitable abatement of fixed rent and additional rent; and, if in Tenant's reasonable opinion it is impracticable for Tenant to remain open for business and Tenant elects to close until restoration has been completed, then there shall be a full abatement of fixed rent and additional rent until Tenant's completion of the restoration work, such abatement not to exceed a period of one hundred eighty (180) days from the date of payment of the condemnation proceeds.

Tenant shall not be entitled to damages for the taking of its leasehold estate or the diminution of the value thereof, provided, if Tenant has made any leasehold improvements to the Premises or material alterations, structural changes or repairs thereto at its own expenses, regardless of when made, Tenant shall be entitled to claim an award for the unamortized balance of Tenant's cost thereof, and if the condemning authority does not make a separate award therefor Landlord shall assign a portion of its award equal to such costs to Tenant. In addition, Tenant shall be entitled to claim an award for loss of business, damage to merchandise and fixtures, removal and reinstallation costs and moving expenses.

## 22.   INSURANCE.

**Section 22.1   Coverages.** (a) Commencing on the Possession Date and throughout the Lease Term, Tenant, at its own cost, shall provide and cause to be maintained comprehensive general liability insurance against claims for bodily injury, death or property damage with respect to the Premises, such insurance to afford minimum protection of not less than Five Million Dollars ($5,000,000) combined single limit coverage per occurrence for bodily injury, death or property damage (including the umbrella policy as provided in Section 22.4 below). Notwithstanding any of the foregoing, Tenant may self-insure all or any part of the insurance it is required to carry hereunder (other than the insurance required pursuant to Section 22.1(b) below) so long as Tenant has a net worth of at least Three Hundred Million Dollars ($300,000,000.00) and/or carry such insurance under a "blanket" policy as provided in Section 22.4 below.

(b)      Commencing on the Possession Date and throughout the Lease Term, Tenant shall, at its own cost, maintain an all risk special form policy insuring against any damage to the Improvements. Such insurance shall also cover all of the interior leasehold improvements in the Building.   Such insurance shall be in the amount of the full replacement cost of such Improvements, exclusive of the cost of foundations, excavations and footings and with a commercially reasonable deductible (not to exceed $100,000.00). The proceeds of any such policy shall be used in accordance with the provisions of, and for the purposes set forth in, Article 19 hereof. Tenant agrees to carry such insurance, it being expressly understood and agreed that none of the items to be insured by Tenant hereunder shall be insured by Landlord, nor shall Landlord be required to reinstall, reconstruct or repair any of such items.

(c)      Commencing on the Possession Date and throughout the Lease Term, Tenant shall maintain at its own cost if and to the extent required by law, worker's compensation or similar insurance in form and amounts required by law.

(d)      To the extent any deductible is maintained by Tenant as a part of any insurance policy required to be maintained by Tenant under this Lease, Tenant shall be deemed to be covering the amount of that deductible under an informal plan of self-insurance and if an event

19

occurs where proceeds would have been available but for the Tenant's election to maintain a deductible or self-insure, Tenant shall make funds available to the same extent that funds would have been available had such policy been carried by Tenant, including the amount of any such deductible.

Section 22.2   **Certificates of Insurance.**  All insurance provided for in this Article shall be effected under policies issued by insurers which are licensed to do business in the State of Florida and, other than the worker's compensation policies required pursuant to Section 22.1(c), rated at least A-VIII by Best's Insurance Rating.  Tenant shall provide to Landlord a certificate of insurance of all policies procured by Tenant in compliance with its obligations under this Lease prior to Tenant entering into possession of the Premises and upon request from Landlord within ten (10) days after any renewal date of such policies.  Neither the issuance of any insurance policy required under this Lease nor the minimum limit specified herein shall be deemed to limit or restrict in any way Tenant's liability arising under or out of this Lease.  In the event that Tenant shall fail to provide the insurance required hereunder, or shall fail to pay the premiums when due, the Landlord shall have the right, upon not less than ten (10) days prior written notice and Tenant's failure to provide such required insurance within such ten (10) day period, to cause such insurance to be issued and to pay the reasonable premiums therefor, or any premiums in default, and to immediately collect the amount of such premiums from Tenant.  The certificates of insurance required to be provided by Tenant hereunder shall contain a provision that the company writing the subject policy will give Landlord thirty (30) days' notice in writing in advance of any cancellation or lapse or material change in coverage.

Section 22.3   **Additional Insured.**  All policies of insurance to be obtained by Tenant under this Article shall name Landlord as insured as its interest may appear and any mortgagee of Landlord pursuant to a standard mortgagee clause, subject in all respects to the terms of this Lease.

Section 22.4   **Blanket Policy; Umbrella Policy.**  Any insurance provided for in this Article to be maintained by Tenant may be effected by a blanket policy or policies of insurance, provided that the amount of the total insurance available shall be at least the protection equivalent to separate policies in the amounts herein required, and provided further that in all other respects, any such policy or policies shall comply with the provisions of this Article.  An increased coverage or "umbrella policy" may be provided and utilized by Tenant to increase the coverage provided by individual or blanket policies in lower amounts, and the aggregate liabilities provided by all such policies shall be satisfactory provided they otherwise comply with the provisions of this Article.

Section 22.5   **Landlord Insurance.**  If Landlord has maintained policies of insurance providing concurrent coverage with Tenant's insurance, then such insurance obtained by Landlord shall be regarded as excess and Tenant's insurance as primary.  The existence of any insurance maintained by Landlord shall not reduce the protection or the payment to be made under Tenant's insurance.

MP2 15330024 11

23.     **SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT.**

At the option of Landlord or any successor-in-interest to all or part of Landlord's interest, this Lease shall be superior or subordinate to the interest of Landlord, any such successor-in-interest or to the lien of any mortgage upon the Premises or any property of which the Premises form a part provided, however, that the subordination of this Lease shall be made upon the condition that in the event of the transfer of all or part of Landlord's interest, whether by sale, foreclosure, or other action taken under a mortgage, any such successor-in-interest shall agree that this Lease and the rights of Tenant hereunder shall not be disturbed but shall continue in full force and effect so long as an Event of Default by Tenant is not then continuing and the proceeds of any insurance recovery or condemnation award shall be used for the purposes stated in this Lease. The word "mortgage," as used herein, includes a mortgage, deed of trust or other similar instrument and any modification, extension, renewal or replacement thereof.   Subject to the foregoing, Tenant agrees to attorn to any such successor-in-interest.

As to any mortgage existing as of the effective date of this Lease, Landlord agrees to deliver to Tenant within thirty (30) days after the execution of this Lease, and Tenant agrees to promptly execute, a Subordination, Non-Disturbance and Attornment Agreement ("SNDA") in substantially the form attached hereto as Exhibit E.  Landlord shall be responsible for obtaining execution of the SNDA by the holder of the mortgage and for recording the SNDA.  Tenant shall not be bound by the terms and provisions thereof until Tenant has received a fully-executed and recorded copy of said SNDA.  If Landlord does not delver such SNDA to Tenant within thirty (30) days after the execution of this Lease, Tenant may terminate this Lease by giving Landlord written notice thereof prior to Tenant's receipt of the SNDA.  Until full execution, recording, and providing a copy of the fully-executed and recorded SNDA to Tenant, Tenant shall have no obligation to pay Rent under this Lease, but the same shall accrue and be payable upon Landlord's delivery of the fully-executed and recorded SNDA.  In addition to the foregoing, Tenant agrees to, within twenty (20) days after Landlord's request from time to time during the Lease term to execute an SNDA in substantially the form attached hereto as Exhibit E.  Landlord shall be responsible for seeing that the SNDA is fully executed and recorded.

24.     **TRANSFER OF INTEREST.**

Landlord may at any time transfer its interest in this Lease and underlying fee, but no transfer or sale of Landlord's interest hereunder shall be binding upon Tenant until Tenant has received a true, correct and complete copy of the original instrument transferring Landlord's interest in this Lease and a certified and conformed copy of any deed conveying Landlord's fee interest in the Premises.  Any such instrument shall evidence the fact that the assignee or transferee thereunder has assumed all of Landlord's obligations under this Lease and acquired sufficient title to the Premises to enable it to perform such obligations.

Tenant shall have the right at any time to assign this Lease or sublet all or any part of the Premises without the consent of Landlord but with notice thereof to Landlord, provided Tenant shall remain liable for the full performance of all terms, covenants and conditions of this Lease; provided, however, in the event of an assignment to any entity with equal or greater net worth (as of the date of this lease) than Tenant's parent public company, Tenant shall be released from all

liability and obligation hereunder effective as of the date of such assignment; and, further provided, that any such assignee or sublessee party shall agree to be bound by all the terms and provisions hereof. Tenant shall also have the right to assign this Lease or sublease the Premises or any portion thereof without the consent of Landlord to any entity (i) controlled by Tenant, or (ii) controlling Tenant, or (iii) controlled by the same entity who directly or indirectly controls Tenant, or (iv) an entity acquiring the majority of Tenant's stores in the state in which the Premises are located (collectively, "Exempt Transfers"). In the event of an assignment whereby Tenant was not, pursuant to the terms hereof, released from its obligations and liability hereunder and the occurrence of a default whereby Landlord regains possession of the Premises, Tenant shall be entitled, but not obligated, to retake possession of the Premises upon written notice thereof given to Landlord within fifteen (15) days after Landlord gives Tenant notice which offers to reinstate this Lease, in which event this Lease shall automatically be deemed reinstated as a lease between Landlord and Tenant as if the assignment had never occurred, without any obligation to operate a business therefrom, but with all the other rights and obligations attendant thereto, and under the same terms and conditions of this Lease, notwithstanding any amendments hereto which may have been made to effectuate an assignment to or accommodate the defaulting assignee; provided, however Tenant shall thereupon be required to cure all then existing monetary defaults and non-monetary defaults that are susceptible to cure. Further, Landlord agrees that, within thirty (30) days of Tenant's written request, Landlord shall execute an estoppel certificate in favor of Tenant and Tenant's assignee or sublessee, containing any factual information with regard to this Lease as may be reasonably requested and reasonably agreed to be provided; provided that, in fact, such facts are accurate and ascertainable.

Any assignment of this Lease or subletting of the Premises permitted under this Lease shall be subject to the following conditions: that the initial Tenant and any assignee(s) of Tenant shall remain jointly and severally liable for the full performance of all Tenant obligations hereunder during the entire term of this Lease (except as otherwise provided herein); that any sublease shall be subject and subordinate to this Lease, and the subtenant shall comply with all the terms and conditions of this Lease (excepting the rental provisions contained herein), including, without limitation, all restrictions upon use of the Premises contained herein; a copy of the document of the assignment or subletting is delivered to Landlord as soon as reasonably possible after the full executing thereof by both parties thereto; and any assignee shall assume in writing all of the Tenant's obligations under this Lease. The collection or acceptance of Rent from any such assignee, transferee, subtenant or occupant shall not constitute a waiver or release of Tenant (or any guarantor hereof) with respect to any covenant or obligation contained herein.

Notwithstanding anything to the contrary contained in this Section 24, except for Exempt Transfers, in the event that Tenant desires to assign this Lease or to sublease more than 50% of the Building, Tenant shall give Landlord written notice ("Transfer Notice") thereof prior to entering into any such assignment or sublease and Landlord shall have the one-time only option to recapture the Premises and terminate this Lease (the "Transfer Recapture Option"), by giving written notice to Tenant within thirty (30) days after receipt of Tenant's Transfer Notice; provided, however, in the event Landlord gives Tenant such termination notice, Tenant shall have the right within fifteen (15) days after its receipt of such notice to give Landlord written notice that Tenant withdraws its intent to assign or sublease (as the case may be), in which event Landlord's termination notice shall be null and void and this Lease and Landlord's Transfer

22

Recapture Option shall remain in full force and effect in accordance with the terms and provisions hereof. Such termination notice from Landlord to Tenant shall specify the date as of which such termination shall be effective, which date shall not be less than thirty (30) days nor more than ninety (90) days after the date on which Landlord sends such notice. If Landlord so elects to terminate this Lease, Tenant shall continue to pay the Rent hereunder to Landlord until the effective date of such termination, on which date Tenant will surrender possession of the Premises in accordance with the provisions hereof and from and after such termination date the parties shall be released and relieved of all obligations hereunder thereafter accruing. In the event Landlord elects to so terminate this Lease, Landlord shall pay to Tenant, upon such termination, an amount equal to the unamortized portion (as of the date of such termination) of the total sums expended by Tenant in the performance of Tenant's Work less the Tenant Allowance, with amortization to be on a straight-line basis over fifteen (15) years. Upon request from Landlord, the total sums expended by Tenant in the performance of Tenant's Work (excluding the Tenant Allowance) shall be reflected in a written itemization certified by an officer of Tenant to Landlord. If Tenant gives Landlord a Transfer Notice and Landlord does not exercise its Transfer Recapture Option, then Landlord's Transfer Recapture Option shall terminate only if Tenant assigns this Lease or subleases more than 50% of the Building (other than an Exempt Transfer) within one (1) year after the date upon which Tenant gave Landlord the Transfer Notice. If Landlord's Transfer Recapture Option is not terminated within such one (1) year period, Tenant must give Landlord another Transfer Notice if Tenant desires to assign this lease or sublease more than 50% of the Building after the expiration of such one (1) year period, other than an Exempt Transfer.

## 25.    REAL ESTATE TAXES.

Tenant shall pay all real estate taxes, fees, charges and all installments of assessments, assessments for public improvements or betterments (and interest due on the installments thereof) and all other governmental impositions, general and special, ordinary and extraordinary, of any kind and nature whatsoever (collectively, the "Taxes") imposed by the taxing authority which accrue with respect to the Premises during the Lease Term promptly as the same shall become due and before interest or penalty accrues thereon. With respect to any special assessments for Taxes which may be paid in installments, only the amount of such installments and interest due thereon (based on the maximum number of installments over which such assessment may be paid) which become due during the Lease Term shall be included in the Taxes to be paid by Tenant.

Tenant shall not be chargeable with nor be obligated to pay (a) any tax of any kind whatsoever which may be imposed on Landlord independent of the Premises or on the Rents payable hereunder (other than the Florida sales tax on Rent), (b) any interest or penalties payable as a result of Landlord's failure to pay any Taxes or assessments prior to delinquency, except the Taxes mentioned in this Article 25 if they are separately billed to Tenant, or (c) any license fees or other fees required to be paid by Landlord in connection with the operation of all or any part of the Premises. All Taxes payable by Tenant under this Lease shall be prorated for any partial tax year at the beginning or end of the Lease Term based on the number of days in such tax year that fall within the Lease Term. Notwithstanding the above, Taxes payable by Tenant for the final year of the Lease Term will be paid by Tenant on the last day of the Lease Term. Taxes for

23

the final year of the Lease Term will be based on the actual value and assessment of Taxes for the final year of the Lease Term, if available. If the actual value and assessment of Taxes for the final year of the Lease Term is not available, the Taxes payable by Tenant will be paid on an estimate of Taxes due during the final year of the Lease Term based upon the best available information (the "Estimate"). As used herein, the "best available information" shall mean the most recent valuation of the Shopping Center or applicable portion of the Premises by the applicable taxing authority, or its successor, and the most recent tax rate established by the applicable taxing authorities. Landlord shall provide the Estimate or final tax bill with all reasonable documentation as to its accuracy at least thirty (30) days prior to the end of the Lease Term. In the event the actual value and assessment of Taxes of the final Lease Term is lower or greater than the Estimate, Landlord shall reimburse Tenant or Tenant shall pay Landlord (as the case may be) the difference within thirty (30) days of receipt of the applicable tax statement.

Landlord shall submit a bill to Tenant together with photostatic copies of all notices regarding the Taxes, including, but not limited to, any assessments, changes of assessments, tax rates, changes of taxes, and tax bills (the "Tax Bill"). The Tax Bill shall be submitted to Tenant at least ten (10) days before the due date. Tenant shall pay the Tax Bill to Landlord on or before the later of (i) ten (10) days prior to the due date of the Taxes, or (ii) thirty (30) days after billing from Landlord. Notwithstanding anything to the contrary that may be contained in this Lease, provided Tenant has timely paid the Taxes to Landlord, Landlord shall have the obligation to (a) promptly pay the Taxes as the same shall become due and before interest or penalty accrues thereon, or (b) pay the Taxes on such earlier date if the applicable taxing authorities offers or allows any discount or credit for payment earlier than the due date, with such discount or credit applicable towards Tenant's proportionate share. Upon request of Tenant, Landlord shall furnish Tenant with proof of payment of the Taxes within sixty (60) days after Tenant's payment. If Landlord fails to provide Tenant of such proof of payment of the Taxes, Tenant shall not be obligated to make further payments of the Taxes until such proof of payment of the Taxes is received by Tenant from Landlord. If Landlord shall cause the taxing authority to send the Tax Bill directly to Tenant, then Tenant shall be required to pay such Tax Bill directly to the taxing authority prior to delinquency and, upon request from Landlord, shall provide Landlord with proof of payment.

Tenant may contest, in good faith, the validity or amount of any Taxes levied against the Premises, whether the Premises are separately assessed or not, by such proceedings as may be appropriate in the jurisdiction and, if permitted under applicable law, may defer payment of such Taxes, pay such Taxes under protest or take such other lawful steps as Tenant may deem appropriate. Landlord shall without cost to Landlord cooperate with the institution and prosecution of any such proceedings and will execute and will provide any documents reasonably required therefor. If Landlord contests the validity or amount of any Taxes levied against the Premises and if any refunds, rebates or abatements are secured by Landlord as a result of such contest, after deducting its costs to obtain the same, Landlord shall pass through the amount of any such refunds, rebates or abatements to Tenant. If Landlord contracts with any outside consultants or services for purposes of seeking any refunds, rebates, or abatements of the Taxes, such contracts will be written on a contingency basis not to exceed, without Tenant's prior consent, one-third (1/3) of the savings. In no event shall Tenant's payment of the costs incurred in seeking a refund, rebate or abatement in Taxes exceed the Tenant's savings resulting

therefrom. In the event of any rebates, refunds or abatements of Taxes, Tenant shall be entitled to such amounts less reasonable out-of-pocket costs paid to independent third parties to obtain the same. Tenant's share shall be refunded to Tenant to the extent previously paid by Tenant within thirty (30) days after receipt by Landlord. Tenant shall be solely responsible to pay any increase in Taxes caused by an contest of the Taxes or of the assessed value of the Premises conducted by, through or under Tenant.

Notwithstanding anything to the contrary contained herein, the definition of Taxes shall not include, and Tenant shall have no obligation to pay, any special assessments attributable to any period prior to the Commencement Date or which relate to the initial construction of the Premises or capital improvements subsequently constructed therein or with respect thereto. Landlord or Tenant shall have the right to contest or seek a reduction in Taxes.

Tenant shall at all times be solely responsible for and shall pay before delinquency all municipal, county, state or federal taxes assessed or levied against any leasehold interest in this Lease or any personal property of any kind owned, installed or used by Tenant in the Premises. If during the Lease Term, a tax or excise on Rents or other tax (other than the Florida sales tax on Rent), however described, is levied or assessed against Landlord on account of or measured by, in whole or in part, the Rent reserved hereunder (excluding any income, corporate franchise, corporate, estate, inheritance, succession, capital stock, corporate loan, corporate bonus, transfer or profit tax in respect of Landlord) as a substitute, in whole or in part, for taxes assessed or imposed on land and buildings, such tax or excise on Rents or other tax shall be included as a part of the Taxes covered hereby, but only to the extent of the amount thereof which is lawfully assessed or imposed as a direct result of Landlord's ownership of this Lease or of the Rent accruing under this Lease. If any real property tax or assessment levied against the land, buildings or improvements covered hereby or the Rents reserved therefrom shall be evidenced by improvement or other bonds or in other form which may be paid in installments, Landlord shall, if permitted, elect such installment payment plan and only the amount paid in any Lease Year shall be included in the taxes for that Lease Year for purposes of this Article 25. If Landlord receives any tax increment financing benefits or any similar incentives based upon (i) real estate taxes generated or expected to be generated by the Premises or (ii) jobs created by Tenant relative to its operation of the Premises, Landlord shall pass through said benefits and/or incentives to Tenant in accordance with the proportionate share of Taxes required to be paid by Tenant as provided in this Article 25.

## 26.   RIGHT OF PROTEST.

Tenant may contest any mechanics' or other liens imposed against the Premises (provided Landlord agrees and acknowledges that Tenant shall have no responsibility with respect to liens arising from construction, repair or maintenance required of Landlord under this Lease); provided Tenant believes in good faith that such liens are not proper; and further provided that Tenant transfers any such lien to bond in accordance with applicable statutory procedures to ensure payment and to prevent any sale, foreclosure or forfeiture of the Premises by reason of such nonpayment. Tenant shall satisfy or shall transfer any such lien to bond within thirty (30) days of receiving a written request therefor. Upon a final determination of the validity of such lien or claim, Tenant shall promptly pay any judgment or decree rendered against Tenant or

25

Landlord, including, without limitation, all proper costs and charges, all without cost to Landlord. If Tenant shall fail to cause such lien to be discharged within thirty (30) days after receipt by Tenant of written notice of the filing thereof or such shorter time if required to prevent a judgment or sale thereunder or which is required for a sale or refinancing of the Premises, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same by paying the amount claimed to be due or by bonding or other proceeding deemed appropriate by Landlord, and the amount so paid by Landlord and/or all costs and expenses, including interest and reasonable attorneys' fees, incurred by Landlord in procuring the discharge of such lien shall be deemed to be additional rent and shall be due and payable by Tenant to Landlord within ten (10) days after written notice.

Notwithstanding any provision of this Lease to the contrary, in accordance with Florida Statutes Section 713.10, Tenant shall never, under any circumstances, have the power to subject the interest of the Landlord in the Premises to any mechanics' or materialmen's liens of any kind. Neither Tenant nor anyone claiming by, through or under Tenant, including, but not limited to, contractors, subcontractors, materialmen, mechanics and laborers, shall have any right to file or place any mechanics' or materialmen's liens of any kind whatsoever, any such liens are hereby specifically prohibited. All parties with whom Tenant may deal shall be put on notice, by the recordation of the memorandum of this Lease, that Tenant has no power to subject the Landlord's interest in the Premises to any mechanics' or materialmen's lien of any kind or character, and all such persons so dealing with Tenant must look solely to the credit of Tenant, and not to Landlord's interest or assets.

## 27.   INTENTIONALLY DELETED.

## 28.   ALTERATIONS TO PREMISES.

Except for changes required by law or by the REA, Landlord will not place or permit to be placed by any person or entity other than Tenant any building, wall, landscaping, fence or other improvement or make any other alterations or changes to the Premises, other than improvements shown as existing or planned on the Site Plan attached hereto as <u>Exhibit B</u>, without Tenant's prior written approval, which approval shall be granted, withheld or conditioned in Tenant's sole and absolute discretion. Landlord will not permit the Common Areas to be used in violation of the REA.

## 29.   GO DARK AND RECAPTURE.

Except for Tenant's obligation to open a fully fixtured and staffed Best Buy consumer electronics store for business to the public for a period of at least one (1) day, nothing else set forth in this Lease shall be construed, in any manner whatsoever, as an implied covenant of continuous operation on the part of Tenant, and Landlord specifically acknowledges that there is no other covenant of continuous operation on the part of Tenant, express or implied. In the event Tenant closes its store in the Premises, such closing shall not be deemed to be an event of default hereunder, nor shall such closing relieve Tenant of any of its liabilities or obligations under this Lease. If Tenant closes its store in the Premises (other than an "Exempted Discontinuance" of operations as hereinafter defined) for nine (9) or more consecutive months, then Landlord shall

26

have the right to recapture the Premises and terminate this Lease by giving Tenant not less than ninety (90) days prior written notice (the "Recapture Notice"), which Recapture Notice may be given at any time prior to the Premises being reopened for business to the public.

The following shall constitute an Exempted Discontinuance of operations: (i) any discontinuance occasioned by restoration work or by an event of force majeure; (ii) the temporary cessation of operations in connection with an executed assignment or sublease (provided that the assignee or subtenant commences operations within six (6) months after the effective date of such assignment or sublease); or (iii) a temporary discontinuance in connection with alterations or remodeling (not to exceed six (6) months).

Notwithstanding the foregoing, Tenant may notify Landlord at any time within thirty (30) days after receipt of Landlord's Recapture Notice that (a) Tenant intends to resume operations, or (b) Tenant is in negotiation for a permitted assignment of this Lease or a sublease of the Premises pursuant to an executed letter of intent that has been provided to Landlord (the "Withdrawal Notice"). If Tenant so notifies Landlord, and if within ninety (90) days thereafter Tenant either resumes operations or enters into such permitted assignment or sublease, then Landlord's notice of termination shall automatically become void and of no force or effect (a "Withdrawal Event"). If a Withdrawal Event does not timely occur, this Lease shall terminate on the later of (a) the termination date set forth in Landlord's Recapture Notice or (b) the ninety-first (91st) day after Tenant's Withdrawal Notice.

In the event Landlord elects to recapture the Premises and terminate this Lease as above provided, Landlord shall pay to Tenant an amount equal to Tenant's unamortized book value of any Improvements which were purchased and paid for entirely by Tenant (and not reimbursed or paid for by Landlord), as set forth in Tenant's books and records, which such amount Tenant agrees to specify in writing within thirty (30) days after Landlord's written request for such amount is received by Tenant.

**30.   USE.**

Landlord represents, warrants and covenants to and with Tenant that as of the date hereof, to Landlord's actual knowledge, based solely on the letter from the Village of Pinecrest attached hereto as <u>Exhibit I</u>, Tenant may lawfully use the Premises for sales, rental, service and warehousing (and, if applicable, installation in motor vehicles) of the product categories listed below ("Tenant's Product Categories"), other products typically sold in the majority of Tenant' stores, and thereafter for any lawful retail use. Tenant's Product Categories (regardless of whether new, used or refurbished) are the following: electronic equipment and appliances (including, without limitation, televisions, stereos, radios and dvd or video machines); major household appliances (including, without limitation, refrigerators, freezers, stoves, microwave ovens, dishwashers, washers and dryers); personal computers and peripherals, computer software; digital, downloadable and streamable entertainment; car radios, stereos, tape decks and phones; entertainment software, including compact discs, music videos, dvds and prerecorded tapes; accessories and connectors for products sold by Tenant (including, without limitation, cable connectors, surge protectors, cables, wires and batteries); telephones, telecopy, facsimile and photocopy machines; photographic cameras and equipment; office equipment, supplies and

furniture; books and magazines; sporting equipment and related items; toys; any substitutes for or items which are a technological evolution of the foregoing items; and/or any other related items carried in a majority of Tenant's stores. Notwithstanding anything to the contrary contained in this Lease, in no event shall Tenant use the Premises in violation of the REA.

In addition to the foregoing, subject to applicable law, Tenant shall have the right to (a) sell gourmet and other food items in support of and incidental to the foregoing product categories, and (b) use up to ten percent (10%) of the Premises for a non-alcoholic beverage kiosk or bar, including seating area, with food, snack and bakery items incidental thereto. Except as set forth in the REA, in no event shall Tenant be bound by any exclusives granted by Landlord to any other party or occupant without Tenant's prior written consent, which consent may be granted or withheld in Tenant's sole and absolute discretion.

## 31.  HAZARDOUS SUBSTANCES.

**31.1   Landlord Indemnification.** Landlord represents and warrants that, to the best of Landlord's knowledge, any handling, transportation, storage, treatment or usage of hazardous or toxic substances (as defined by any applicable government authority and hereinafter being referred to as "Hazardous Materials") that has occurred on the Premises was in compliance with all applicable federal, state and local laws, regulations and ordinances. Landlord further represents and warrants that, to the best of Landlord's knowledge, no leak, spill, discharge, emission or disposal of Hazardous Materials has occurred on the Premises and that the soil, groundwater, and soil vapor on or under the Premises is free of Hazardous Materials to the extent required by law as of the date hereof. Landlord agrees to indemnify, defend and hold Tenant and its officers, partners, directors, shareholders, employees and agents harmless from any claims, judgments, damages, fines, penalties, costs (including reasonable attorney, consultant and expert fees), liabilities (including sums paid in settlement of claims) or loss which Tenant may incur, sustain or suffer or which may be asserted against Tenant by reason of any violation of any representation or warranty made by Landlord in this Article 31; any liability Tenant may incur for cleanup or response costs, fines or penalties resulting from a release or a threatened release of any Hazardous Materials; and any personal injury, death, property, property damage, business losses, or damage to the environment.

**31.2   Tenant Indemnification.** Tenant covenants and agrees not to dispose of or discharge any Hazardous Materials on, in, or about the Premises. Tenant shall not bring onto the Premises any Hazardous Materials other than substances customarily found in retail stores, e.g., copier toner, cleaning fluids, etc., and then only to the extent in compliance with all applicable laws. If Tenant, its agents, employees, invitees or contractors dispose of or discharge any Hazardous Materials, in or about the Premises, Landlord will have the right (but not the obligation) to cure such default (at Tenant's sole expense), including the repair of the Premises. The amount so paid by Landlord, together with any reasonable attorneys' fees incurred by Landlord, shall be immediately due from Tenant to Landlord as additional rent. Tenant shall indemnify, protect, defend, and hold Landlord, Landlord's directors, officers and shareholders harmless from and against any and all claims, demands, fines, judgments, damages, costs (including reasonable attorney, consultant and expert fees), losses, liabilities, and penalties (including sums paid in settlement of claims) or loss arising from or out of any violation within

28

the Premises by Tenant, its agents, contractors, invitees or employees of any local, state or federal environmental law, regulation, ordinance or administration or judicial order relating to any Hazardous Materials.

**32.   ESTOPPEL CERTIFICATE.**

Within thirty (30) days after request therefor by the other, Landlord and Tenant agree to execute in recordable form and deliver a statement, in writing, certifying (a) that this Lease is in full force and effect, (b) the Commencement Date of this Lease, (c) that Rent is paid currently, (d) the amount of Rent, if any, paid in advance, (e) that there are no uncured Landlord Defaults or stating those claimed by Tenant, (f) that there are no defenses of offsets against the enforcement of this Lease or the Rent, or stating those claimed, (g) that all conditions under this lease to be performed by Landlord have been satisfied except as otherwise stated, and (h) such other information as may be reasonably requested and reasonably agreed to be provided; provided that, in fact, such facts are accurate and ascertainable.

**33.   PARKING.**

On the Possession Date, the Landlord shall deliver position of the Premises to Tenant with the parking areas and driveways located on the Premises in its "As Is" configuration and condition existing as of the date of this Lease.  Except for changes required by applicable law or by the REA, Landlord covenants and agrees that it will not alter or change the configuration of the parking areas or driveways located on the Premises without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion.

**34.   ATTORNEY'S FEES.**

If Tenant or Landlord shall be in breach or default under this Lease, such party (the "Defaulting Party") shall reimburse the other party (the "Non-defaulting Party") upon demand for any costs or expenses that the Non-defaulting Party incurs in connection with any breach or default of the Defaulting Party under this Lease, whether or not suit is commenced or judgment entered.  Such costs shall include legal fees and costs incurred for the negotiation of a settlement, enforcement of rights or otherwise.  Furthermore, if any action for breach of or to enforce the provisions of this Lease is commenced, the court in such action shall award to the party in whose favor a judgment is entered, a reasonable sum as attorneys' fees and costs.  The losing party in such action shall pay such attorneys' fees and costs.  Notwithstanding the above, the plaintiff shall not be considered the prevailing party unless the plaintiff prevails in a majority of its claims.  If Landlord is responsible for and fails to pay any such fees within ten (10) days after demand, Tenant may deduct the amount of such fees from the Rent and other charges otherwise due hereunder.

**35.   BROKERAGE.**

Landlord and Tenant represent and warrant to each other that (i) other than The Shopping Center Group and Suchman Retail Group, Inc. (together, the "Authorized Brokers"), neither has dealt with any other brokers or agents and that there are no other side letters, contracts or agreements

29

relating to, or entitling others to share or participate in, brokerage fees, commissions, finder's fees or other similar charges, (ii) other than the Authorized Brokers, no other brokerage fees, commissions, finder's fees or other similar charges are owed to any persons, entities or other parties in connection with this Lease, and (iii) the Authorized Brokers are the only brokers involved in connection with this Lease.

Landlord agrees to pay the Authorized Brokers' fees pursuant to a separate agreement on or before the Commencement Date, and further agrees to defend, indemnify and hold Tenant harmless from any loss, claim, liability or obligations with regard thereto. If Landlord fails to pay the Authorized Brokers' fees on or before the Commencement Date, Tenant shall have the right, but not the obligation, to pay the Authorized Brokers' fees. If Tenant pays all or any portion of the Authorized Brokers' fees, Landlord agrees that Tenant shall have the right to offset against fixed rent and other amounts payable under this Lease for the total amount of the Authorized Brokers' fees paid by Tenant, plus interest accruing thereon at the Interest Rate, until the Authorized Brokers' fees and interest are paid in full.

## 36.   NOTICES.

Any notice or consent required to be given by or on behalf of either party to the other shall be in writing and given either (i) one (1) business day after sending by an overnight courier service, or (ii) two (2) business days after sending by registered or certified mail, return receipt requested, to the other party at the address set forth in Article I.G. hereof, or at such other address in the United States as may be specified from time to time in writing by either party. Any notice or consent given hereunder by either party shall be deemed effective when mailed as aforesaid, but the time period in which to respond to any notice or consent shall commence to run on the date on which such notice or consent is actually received by the addressee. Refusal to accept delivery shall be deemed receipt thereof.

## 37.   MISCELLANEOUS.

37.1   **Severability of Provisions.**   If any term or provision of this Lease, or the application thereof to any person or circumstance, shall be determined to be invalid or unenforceable by a court of competent jurisdiction, then the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby.

37.2   **Memorandum of Lease.**   Neither party may record this Lease. Upon execution of this Lease, however, Landlord and Tenant shall join in the execution of a memorandum or so-called "short form" of this Lease for the purposes of recordation ("Memorandum of Lease") substantially in the form attached hereto as Exhibit F and made a part hereof. Tenant may, at its expense, record the Memorandum of Lease in the appropriate real estate records office for the county in which the Premises are located (provided that Landlord shall cooperate with Tenant to record such Memorandum of Lease). In the event of any conflict between the provisions of the Memorandum of Lease and this Lease, this Lease shall control. Upon the termination of this Lease, Tenant shall promptly record a termination of any such recorded Memorandum of Lease.

MP2 35330024.11

**37.3    Entire Agreement.**  This Lease shall merge all undertakings between the parties hereto with respect to the Premises and upon execution by both parties shall constitute the entire agreement between the parties with respect to the Premises, unless thereafter modified by both parties in writing.  If Landlord executes this Lease prior to Tenant, Tenant shall have ten (10) days to accept the terms hereof and to execute this Lease, during which time Landlord's execution shall constitute an irrevocable offer.

**37.4    Relationship of the Parties.**  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by a third party to create the relationship of principal and agent or of partnership or of joint venture of any association whatsoever between Landlord and Tenant, it being expressly understood and agreed that neither the method or computation of Rent nor any other provision contained herein, nor any act or acts of the parties hereto, shall be deemed to create any relationship between Landlord and Tenant other than the relationship of lessor and tenant.

**37.5    Importance of Each Covenant.**  Each covenant and agreement on the part of a party hereto constitutes an essential part of the consideration for each covenant and agreement on the part of the other party.  Notwithstanding the foregoing, each party's remedies shall be determined as provided in the Lease, it being understood, by way of example and not limitation, that neither party may unilaterally withhold any obligation based on another party's failure to comply with a Lease obligation except to the extent expressly provided for under the Lease.

**37.6    Headings.**  The headings of the Articles of this Lease are for convenience of reference only and do not form a part hereof, and they shall not be interpreted or construed to modify, limit, or amplify the terms of such this Lease.

**37.7    Parties in Interest.**  Subject to the provisions of this Lease relating to assignment, subleasing and other transfers of the parties' interests, this Lease shall inure to the benefit of and be binding upon the successors in interest and assigns of the parties hereto.

**37.8    Counterparts.**  This Lease may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

**37.9    Number and Gender.**  Words in the singular, plural, masculine, feminine and neuter as used herein shall have the meanings and be construed as required by the context in which they are used herein.

**37.10    Governing Law and Venue.**  This Lease shall be construed and governed by the laws of the State in which the Premises are located.  As used herein, the term "State" shall also be deemed to include a "commonwealth."  Venue for any litigation under this Lease shall be in Miami-Dade County, Florida.

**37.11    Prorations.**  Any prorations to be made under this Lease shall be based on a 365 day year.

MP2 15330024.11

**37.12   Confidentiality.**  The parties agree that the terms and conditions of this Lease are to remain confidential and may not be disclosed to any third party without the other party's prior written consent except for disclosures as shall be reasonably necessary in the conduct of such party's business such as disclosures to such party's attorneys, lenders and potential buyers and disclosures as shall be necessary by applicable law.

**37.13   Construction.**  Landlord and Tenant each agree that this Lease was fully and mutually negotiated by the parties such that this Lease and the provisions hereof shall not be construed against either party based on such party's drafting or alleged drafting of same.

**37.14   REA.**  The Premises is subject to the "REA."  As used herein, the term "REA" shall mean that certain Declaration of Restrictions dated January 20, 1962, between South Miami Investment Co., a Florida corporation and E.L. Cotton, Inc., a Florida corporation, as recorded February 8, 1962 in Official Records Book 3014, at Page 455, of the Public Records of Miami-Dade County, Florida, as amended.  Landlord covenants not to terminate or consent to any modification of the REA which would adversely affect the parking areas, access to the Premises, the visibility of the Premises or Tenant's signage, or to any other modification which would adversely affect the Premises without the written consent of Tenant, which consent shall not be unreasonably withheld or delayed.  Landlord covenants that, in the event of a violation of said REA, Landlord will promptly and as expeditiously as possible, after notice, take any and all steps necessary to terminate a violation.  If Landlord shall fail to take such action to terminate such violation, Tenant may file suit on Landlord's behalf and seek an injunction against any violation, in which event Landlord shall reimburse Tenant for court costs, reasonable attorneys fees and other expenses of litigation if Tenant prevails in such litigation.  During the Lease Term, Tenant shall be responsible for any dues, assessments or other payments under the REA.

**37.15   Radon Disclosure.**  In accordance with the requirements of Florida Statutes Section 404.056(8), the following notice is hereby given to Tenant: RADON GAS: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time.  Levels of radon that exceed federal and state guidelines have been found in buildings in Florida.  Additional information regarding radon and radon testing may be obtained from your County Public Health Unit.

**37.16   Waiver of Jury Trial.**  Landlord and Tenant each hereby waives trial by jury in any action, proceeding or counterclaim brought by either party with respect to any matter arising out of or in any way connected with this Lease or the use and occupancy of the Premises.

**37.17   Time of the Essence.**  It is expressly agreed by Landlord and Tenant that time is of the essence with respect to this Lease and each and every provision hereof.

**37.18   Exculpation.**  So long as Landlord has paid to Tenant the Tenant Allowance in full, Tenant shall look solely to the Landlord's interest in the land and building (and sale proceeds therefrom) comprising the Premises for the collection of any judgment, or in connection with any other judicial process, requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of this Lease to be observed and performed by Landlord and no other property or

32

estates of Landlord shall be subject to levy, execution or other enforcement procedures for the satisfaction of Tenant's remedies and rights under this Lease.  If Landlord or any successor in interest shall be an individual, joint venture, tenancy in common, firm or partnership, general or limited, there shall be no personal liability on such individual or on the members of such joint venture, tenancy in common, firm or partnership, or on such joint venture, tenancy in common, firm or partnership, in respect to any of the covenants or conditions of this Lease.

II.    **EXHIBITS.**

Attached hereto and made a part of this Lease are Exhibits A through H.

[SIGNATURES ON NEXT PAGE.]

MP2 15330024.11

**IN WITNESS WHEREOF**, the parties hereto have executed this Lease as of the date first above written.

**LANDLORD:**

Signed, sealed and delivered
in the presence of:

**MARIA INVESTMENTS, INC.,**
a Florida corporation



By:
Name: Azhar Said
Its: President

Witness

Witness

Date: May 29, 2007

**TENANT:**

Signed, sealed and delivered
in the presence of:

**BEST BUY STORES, L.P.,**
a Virginia limited partnership

Witness

By: BBC Property Co., a Minnesota corporation,
its general partner

Witness

By:
Name:
Its:

Date:

**IN WITNESS WHEREOF,** the parties hereto have executed this Lease as of the date first above written.

**LANDLORD:**

Signed, sealed and delivered
in the presence of:

**MARIA INVESTMENTS, INC.,**
a Florida corporation

_____
Witness

By: _____
Name: _____
Its: _____

_____
Witness

Date: _____

**TENANT:**

Signed, sealed and delivered
in the presence of:

**BEST BUY STORES, L.P.,**
a Virginia limited partnership

_____
Witness

By:    BBC Property Co., a Minnesota corporation,
       its general partner

_____
Witness

By: _____
Name: _Patrick R. Matre_____
Its: _V.P._____

Date: _June 6, 2007_____

# EXHIBIT A

## Legal Description of the Premises

A portion of Lots 20 and 22 and all of Lot 21 of Block 4 of Suniland Center, First Amended Plat, according to the Plat thereof, recorded in Plat Book 57, Page 14, of the Public Records of Dade County, Florida. and a portion of the Southwesterly 1000.00 feet of Tract "B" of Suniland Terrace. according to the Plat thereof, recorded in Plat Book 65, Page 26, of the Public Records of Dade County. Florida, being more particularly described as follows:

Commence at the most Westerly corner of said Lot 22; thence North 24°52'55" East along the Northwesterly line of said Lot 22 for 5.00 feet to the Point of Beginning of the parcel herein described; thence from the above established Point of Beginning continue North 24°52'55" East along the said Northwesterly line of Lot 22 and along the Northwesterly lines of Lots 21 and 20 for 120.00 feet; thence South 65° 07'05" East along a line that is 25.00 feet Northeasterly of and parallel to the Southwesterly line of said Lot 20 and along the Southwesterly line of the Northwesterly 1000.00 feet of said Tract "B" for 330.00 feet to a point on the Southeasterly line of said Tract "B"; thence South 24°52'55" West along the said Southeasterly line of Tract "B" for 200.00 feet; thence North 65°07'05" West for 53.17 feet; thence North 24°52'55" East for 80.00 feet; thence North 65°07'05" West along a line that is 5.00 feet Northeasterly of and parallel to the Southwesterly line of said Lot 22 and its Southeasterly extension for 276.83 feet to the Point of Beginning.

## EXHIBIT A-1

### Legal Description of Shopping Center

All of Block 4 except Lot 28 and the Southerly 20 feet of Lot 27 in SUNILAND CENTER, according to the Plat thereof, recorded in Plat Book 57 at Page 14 of the Public Records of Dade County, Florida, and all of Tract "B" of SUNILAND TERRACE, according to the Plat thereof, recorded in Plat Book 65 at Page 26 of the Public Records of Dade County, Florida.





Shopping Center





Premises                    Building after completion of Tenant's Work

*Restrictions/Easements:*

1. All matters contained on the Plat of Suniland Center, as recorded in Plat Book 57, Page(s) 14, Public Records of Miami-Dade County, Florida.

2. All matters contained on the Plat of Suniland Terrace, as recorded in Plat Book 65, Page(s) 26, Public Records of Miami-Dade County, Florida.

3. Covenants, conditions and restrictions recorded February 8, 1962, in O.R. Book 3014, Page 455, as amended in O. R. Book 4582, Page 477, O. R. Book 4593, Page 163 and O. R. Book 6113, Page 130 of the Public Records of Miami-Dade County, Florida.

4. Covenants, conditions and restrictions recorded November 23, 1954, in Deed Book 4001, Page 473, as partially revoked in Deed Book 4068, Page 409 of the Public Records of Miami-Dade County, Florida.

5. Covenants, conditions and restrictions recorded September 28, 1987, in O.R. Book 13427, Page 1166, as amended in O. R. Book 14523, Page 1408 of the Public Records of Miami-Dade County, Florida.

6. Covenants, conditions and restrictions recorded March 23, 1988, in O.R. Book 13617, Page 1338, Public Records of Miami-Dade County, Florida.

7. Covenants, conditions and restrictions recorded August 15, 1988, in O.R. Book 13785, Page 1185, Public Records of Miami-Dade County, Florida.

8. Covenants, conditions and restrictions recorded August 16, 1988, in O.R. Book 13786, Page 1914, Public Records of Miami-Dade County, Florida.

9. Covenants, conditions and restrictions recorded October 7, 1995, in O.R. Book 16082, Page 2737, Public Records of Miami-Dade County, Florida.

10. Easement contained in instrument recorded in O.R. Book 14123, Page 3491, as amended in O. R. Book 16090, Page 2427 of the Public Records of Miami-Dade County, Florida.

11. Easement in favor of Metropolitan Dade County recorded in O.R. Book 16082, Page 2707, Public Records of Miami-Dade County, Florida.

12. Agreement recorded in O.R. Book 13345, Page 2346, as affected by Affidavit recorded in O. R. Book 18155, Page 1613 of the Public Records of Miami-Dade County, Florida.

13. Agreement for the construction of Water and Sanitary Sewage Facilities recorded in O.R. Book 13617, Page 1308, Public Records of Miami-Dade County, Florida.

14. Unity of Title recorded in O.R. Book 13617, Page 1335, Public Records of Miami-Dade County, Florida.

15. Resolution recorded in O.R. Book 15677, Page 1335, Public Records of Miami-Dade County, Florida.

*Mortgages, Assignments and Modifications:*

2. Mortgage to Union Planters Bank, mortgagee(s), recorded under O.R. Book 22086, Page 145, Public Records of Miami-Dade County, Florida, as modified by Agreement recorded in O. R. Book 24140 at Page 3197.

3. Mortgage to Union Planters Bank, mortgagee(s), recorded under O.R. Book 22086, Page 169, Public Records of Miami-Dade County, Florida.

4. Financing Statement (UCC-1) recorded in O.R. Book 22086, Page 141, Public Records of Miami-Dade County, Florida.



REAR ELEVATION

Exhibit D





# TITLE SEARCH REPORT

*Fund File Number:* 10-2007-6379

*The information contained in this title search is being furnished by Attorneys' Title Insurance Fund, Inc. If this report is to be used by a title insurance agent for evaluation and determination of insurability by the agent prior to the issuance of title insurance, then the agent shall have liability for such work.*

*Provided For:* Greenberg Traurig, P.A.                    *Agent's File Reference:* 103197.010100

*After an examination of this search the Agent must:*

A.   *Evaluate all instruments, plats and documents contained in the report.*

B.   *Include in the Commitment under Schedule B, any additional requirements and/or exceptions you find necessary from your analysis of the surveys, prior title evidence or other relevant information from the transaction.*

C.   *Verify the status of corporations and limited partnerships and other business entities with the appropriate governmental agency or other authority.*

D.   *Determine whether the property has legal access.*

E.   *Determine if any unpaid municipal taxes or assessments exist, which are not recorded in the Official Records Books of the county.*

F.   *Determine whether any portion of the property is submerged or artificially filled, if the property borders a body of water, and if riparian or littoral rights exist.*

G.   *The information provided herein does not include a search of federal liens and judgment liens filed with the Florida Department of State pursuant to Sec. 713.901, et seq., F.S., and Sec. 55.201, et seq., F.S., respectively, which designate the Florida Department of State as the place for filing federal liens and judgment liens against personal property. For insuring purposes:*

    (a)   *Pursuant to Sec. 713.901, et seq., F.S., personal property includes, but is not limited to, mortgages, leaseholds, mortgages on leaseholds, interests in cooperative associations, vendees' interests, and options when those interests are held by a partnership, corporation, trust or decedent's estate; and*

    (b)   *Pursuant to Sec. 55.201, et seq., F.S., personal property includes, but is not limited to, leaseholds, interests in cooperative associations, vendees' interests, and options regardless of the type of entity holding such interests, including individuals. (Note: Mortgages have been specifically excluded from the personal property interests in which a judgment lien may be acquired under the provisions of Sec. 55.201, et seq., F.S.)*

*Prepared this* 2nd day of May, 2007.                    *Attorneys' Title Insurance Fund, Inc.*

*Prepared by:* Stephen W. Ross
*Phone Number:* 954-771-0150

# TITLE SEARCH REPORT

*Fund File Number:* 10-2007-6379

*Effective Date of Fund approved base title information:* April 5, 1999

*Effective Date of Search:* April 16, 2007 *at* 11:00 PM

*Apparent Title Vested in:*

Maria Investments, Inc., a Florida corporation

*Description of real property to be insured/foreclosed situated in* Miami-Dade *County, Florida.*

A portion of Lots 20 and 22 and all of Lot 21 of Block 4 of Suniland Center, First Amended Plat, according to the Plat thereof, recorded in Plat Book 57, Page 14, of the Public Records of Dade County, Florida. and a portion of the Southwesterly 1000.00 feet of Tract "B" of Suniland Terrace. according to the Plat thereof, recorded in Plat Book 65, Page 26, of the Public Records of Dade County. Florida, being more particularly described as follows:
Commence at the most Westerly corner of said Lot 22; thence North 24°52'55" East along the Northwesterly line of said Lot 22 for 5.00 feet to the Point of Beginning of the parcel herein described; thence from the above established Point of Beginning continue North 24°52'55" East along the said Northwesterly line of Lot 22 and along the Northwesterly lines of Lots 21 and 20 for 120.00 feet; thence South 65° 07'05" East along a line that is 25.00 feet Northeasterly of and parallel to the Southwesterly line of said Lot 20 and along the Southwesterly line of the Northwesterly 1000.00 feet of said Tract "B" for 330.00 feet to a point on the Southeasterly line of said Tract "B"; thence South 24°52'55" West along the said Southeasterly line of Tract "B" for 200.00 feet; thence North 65°07'05" West for 53.17 feet; thence North 24°52'55" East for 80.00 feet; thence North 65°07'05" West along a line that is 5.00 feet Northeasterly of and parallel to the Southwesterly line of said Lot 22 and its Southeasterly extension for 276.83 feet to the Point of Beginning.

*Muniments of Title, including bankruptcy, foreclosure, quiet title, probate, guardianship and incompetency proceedings, if any, recorded in the Official Records Books of the county:*

1.  Special Warranty Deed from Commercial Net Lease Realty, Inc. to Maria Investments, Inc., recorded April 5, 1999, in O.R. Book 18548, Page 4320, Public Records of Miami-Dade County, Florida.

*Mortgages, Assignments and Modifications:*

1.  Mortgage to Commercial Net Lease Realty, Inc., mortgagee(s), recorded under O.R. Book 18548, Page 4323, Public Records of Miami-Dade County, Florida, together with Assignment of Rents and Leases recorded in O.R. Book 18548, Page 4347 and Financing Statement recorded in O.R. Book 18548 at Page 4352. Note: We do not find any satisfaction of record. Enforcement appears to barred under Sec. 95.281, Fla. Stat.

# TITLE SEARCH REPORT

*Fund File Number:* 10-2007-6379

2.  Mortgage to Union Planters Bank, mortgagee(s), recorded under O.R. Book 22086, Page 145, Public Records of Miami-Dade County, Florida, as modified by Agreement recorded in O. R. Book 24140 at Page 3197.

3.  Mortgage to Union Planters Bank, mortgagee(s), recorded under O.R. Book 22086, Page 169, Public Records of Miami-Dade County, Florida.

4.  Financing Statement (UCC-1) recorded in O.R. Book 22086, Page 141, Public Records of Miami-Dade County, Florida.

*Other Property Liens:*

1.  Taxes and assessments for the year 2006 under Account Number 5010-004-0690 which are UNPAID.

*Restrictions/Easements:*

1.  All matters contained on the Plat of Suniland Center, as recorded in Plat Book 57, Page(s) 14, Public Records of Miami-Dade County, Florida.

2.  All matters contained on the Plat of Suniland Terrace, as recorded in Plat Book 65, Page(s) 26, Public Records of Miami-Dade County, Florida.

3.  Covenants, conditions and restrictions recorded February 8, 1962, in O.R. Book 3014, Page 455, as amended in O. R. Book 4582, Page 477, O. R. Book 4593, Page 163 and O. R. Book 6113, Page 130 of the Public Records of Miami-Dade County, Florida.

4.  Covenants, conditions and restrictions recorded November 23, 1954, in Deed Book 4001, Page 473, as partially revoked in Deed Book 4068, Page 409 of the Public Records of Miami-Dade County, Florida.

5.  Covenants, conditions and restrictions recorded September 28, 1987, in O.R. Book 13427, Page 1166, as amended in O. R. Book 14523, Page 1408 of the Public Records of Miami-Dade County, Florida.

6.  Covenants, conditions and restrictions recorded March 23, 1988, in O.R. Book 13617, Page 1338, Public Records of Miami-Dade County, Florida.

7.  Covenants, conditions and restrictions recorded August 15, 1988, in O.R. Book 13785, Page 1185, Public Records of Miami-Dade County, Florida.

8.  Covenants, conditions and restrictions recorded August 16, 1988, in O.R. Book 13786, Page 1914, Public Records of Miami-Dade County, Florida.

9.  Covenants, conditions and restrictions recorded October 7, 1995, in O.R. Book 16082, Page 2737, Public Records of Miami-Dade County, Florida.

# TITLE SEARCH REPORT

*Fund File Number*: 10-2007-6379

10. Easement contained in instrument recorded in O.R. Book 14123, Page 3491, as amended in O. R. Book 16090, Page 2427 of the Public Records of Miami-Dade County, Florida.

11. Easement in favor of Metropolitan Dade County recorded in O.R. Book 16082, Page 2707, Public Records of Miami-Dade County, Florida.

12. Agreement recorded in O.R. Book 13345, Page 2346, as affected by Affidavit recorded in O. R. Book 18155, Page 1613 of the Public Records of Miami-Dade County, Florida.

13. Agreement for the construction of Water and Sanitary Sewage Facilities recorded in O.R. Book 13617, Page 1308, Public Records of Miami-Dade County, Florida.

14. Unity of Title recorded in O.R. Book 13617, Page 1335, Public Records of Miami-Dade County, Florida.

15. Resolution recorded in O.R. Book 15677, Page 1335, Public Records of Miami-Dade County, Florida.

*Other Encumbrances:*

None

## REAL PROPERTY TAX INFORMATION ATTACHED

*Proposed Purchaser/Mortgagor:*

N/A

*The name of the proposed purchaser/mortgagor was searched for the past twenty years for unsatisfied judgments and tax liens (state, federal and other liens for the recovery of money) and personal names were checked for unrestored incompetency and for guardianship proceedings. The following matters appeared of record and copies are attached for evaluation by the agent:*

None

## STANDARD EXCEPTIONS

*Unless satisfactory evidence is presented to the agent eliminating the need for standard exceptions, the following should be made a part of any commitment or policy.*

# TITLE SEARCH REPORT

*Fund File Number:* 10-2007-6379

1. *Taxes for the year of the effective date of this policy and taxes or special assessments which are not shown as existing liens by the public records.*

2. *Rights or claims of parties in possession not shown by the public records.*

3. *Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.*

4. *Easements or claims of easements not shown by the public records.*

5. *Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.*

6. *Any owner policy issued pursuant hereto will contain under Schedule B the following exception: Any adverse ownership claim by the State of Florida by right of sovereignty to any portion of the lands insured hereunder, including submerged, filled and artificially exposed lands, and lands accreted to such lands.*

7. *Federal liens and judgment liens, if any, filed with the Florida Department of State pursuant to Sec. 713.901, et seq., F.S., and Sec. 55.201, et seq, F.S., respectively, which designate the Florida Department of State as the place for filing federal liens and judgment liens against personal property. For insuring purposes:*

    (a) *Pursuant to Sec. 713.901, et seq., F.S., personal property includes, but is not limited to, mortgages, leaseholds, mortgages on leaseholds, interests in cooperative associations, vendees' interests, and options when those interests are held by a partnership, corporation, trust or decedent's estate; and*

    (b) *Pursuant to Sec. 55.201, et seq., F.S., personal property includes, but is not limited to, leaseholds, interests in cooperative associations, vendees' interests, and options regardless of the type of entity holding such interests, including individuals. (Note: Mortgages have been specifically excluded from the personal property interests in which a judgment lien may be acquired under the provisions of Sec. 55.201, et seq., F.S.)*

8. *Any lien provided by County Ordinance or by Chapter 159, Florida Statutes, in favor of any city, town, village or port authority, for unpaid service charges for services by any water systems, sewer systems or gas systems serving the land described herein; and any lien for waste fees in favor of any county or municipality.*

*This report does not cover matters filed in the Federal District Courts of Florida EXCEPT FOR BANKRUPTCY PROCEEDINGS filed prior to October 7, 1984, when the property lies in either DADE, DUVAL, HILLSBOROUGH, LEON OR ORANGE COUNTY.*

*In foreclosure proceedings, title should be examined between the effective date of this report and the recording of the lis pendens to assure that all necessary and proper parties are joined. Consideration should be given to joining as defendants any persons in possession, other than the record owner, and any parties, other than those named herein, known to the plaintiff or the plaintiff's attorney and having or claiming an interest in the property.*

# TITLE SEARCH REPORT

*Fund File Number:* 10-2007-6379

*Prior to issuance of any policy of title insurance underwritten by the Company, the agent must obtain and evaluate a title search for the period between the effective date of this Title Search Report and the recording date(s) of the instrument(s) on which the policy is based.*

*If this product is not used for the purpose of issuing a Fund policy, then the maximum liability for incorrect information is $1,000.*

*Note:  The Fund Agent is responsible for obtaining underwriting approval on any commitment prepared from this product in the amount of $3,000,000.00 or more.*





# VILLAGE OF PINECREST
## DEPARTMENT OF BUILDING & PLANNING

James H. Holland, AICP
*Planning Director*

May 21, 2007

Mr. Michael Radell
Bercow Radell & Fernandez
200 S. Biscayne Boulevard
Suite 850
Miami, FL 33131

Re:     Proposed Reuse of 11941 S. Dixie Highway, Pinecrest, Florida
        as a Best Buy Store

Dear Mr. Radell:

In response to your letter and on behalf of the Village of Pinecrest ("Village"), I hereby confirm that the property described in Exhibit A attached hereto is zoned BU-1A in accordance with the Land Development Regulations and Official Zoning Map of the Village. The existing improvements of this property, consisting of approximately 40,000 square feet of retail floor area located on 2 floors and associated parking, drive isles, signage, and landscaping, may be used for any purpose listed as a permitted use in the BU-1A zoning district.

A Best Buy store, similar to the ones that are located in Miami-Dade County, is a permitted use in the BU-1A zoning district in the Village of Pinecrest. This would include the sale, rental and servicing of consumer electronics and other appliances, as well as the storage of stock intended for retail sales. Any modifications to the floor plan or site plan of this property will require approval by the Village in accordance with adopted rules, regulations and building codes. Specifically, any change in the use of any portion of the property to a use other than general retail as permitted under the BU-1A zoning district will be subject to the Village's parking requirements for that new use. Any revisions to the site plan for the property will require approval by the Village as a modification of the site plan originally approved by Miami-Dade County when the building was first constructed.

Your clients and Best Buy may rely on this information. Please call me if you have any questions or need additional information.

Very truly yours,

James H. Holland, AICP
Planning Director

## EXHIBIT A

*Description of real property to be insured/foreclosed situated in* Miami-Dade County, Florida.

A portion of Lots 20 and 22 and all of Lot 21 of Block 4 of Suniland Center, First Amended Plat, according to the Plat thereof, recorded in Plat Book 57, Page 14, of the Public Records of Dade County, Florida, and a portion of the Southwesterly 1000.00 feet of Tract "B" of Suniland Terrace, according to the Plat thereof, recorded in Plat Book 65, Page 26, of the Public Records of Dade County, Florida, being more particularly described as follows:

Commence at the most Westerly corner of said Lot 22; thence North 24°52'55" East along the Northwesterly line of said Lot 22 for 5.00 feet to the Point of Beginning of the parcel herein described; thence from the above established Point of Beginning continue North 24°52'55" East along the said Northwesterly line of Lot 22 and along the Northwesterly lines of Lots 21 and 20 for 120.00 feet; thence South 65° 07'05" East along a line that is 25.00 feet Northeasterly of and parallel to the Southwesterly line of said Lot 20 and along the Southwesterly line of the Northwesterly 1000.00 feet of said Tract "B" for 330.00 feet to a point on the Southeasterly line of said Tract "B"; thence South 24°52'55" West along the said Southeasterly line of Tract "B" for 200.00 feet; thence North 65°07'05" West for 53.17 feet; thence North 24°52'55" East for 80.00 feet; thence North 65°07'05" West along a line that is 5.00 feet Northeasterly of and parallel to the Southwesterly line of said Lot 22 and its Southeasterly extension for 276.83 feet to the Point of Beginning.

List of Products that are Sold, Stored and Serviced at Best Buy

Electronic equipment and appliances (including, without limitation, televisions, stereos, radios and dvd or video machines); major household appliances (including, without limitation, refrigerators, freezers, stoves, microwave ovens, dishwashers, washers and dryers); personal computers and peripherals, computer software; digital, downloadable and streamable entertainment; car radios, stereos, tape decks and phones; entertainment software, including compact discs, music videos, dvds and prerecorded tapes; accessories and connectors for these products (including, without limitation, cable connectors, surge protectors, cables, wires and batteries); telephones, telecopy, facsimile and photocopy machines; photographic cameras and equipment; office equipment, supplies and furniture; books and magazines; sporting equipment and related items; toys; any substitutes for or items which are a technological evolution of the foregoing items.



CFN 2008R0380331
OR Bk 26368 Pgs 4251 - 4256; (6pgs)
RECORDED 05/08/2008 15:54:31
HARVEY RUVIN, CLERK OF COURT
MIAMI-DADE COUNTY, FLORIDA

**WHEN RECORDED, RETURN TO:**

**Robins, Kaplan, Miller & Ciresi L.L.P.**
**2800 LaSalle Plaza**
**800 LaSalle Avenue**
**Minneapolis, MN 55402-2015**
**Attention Martina Sailer, Esq.**
**(Best Buy Store #1503)**

---

Space Above This Line for Recorder's Use

**MEMORANDUM OF LEASE AGREEMENT**

This Memorandum of Lease Agreement (this "Memorandum") is executed as of ___May 7___, 2008 by and between MARIA INVESTMENTS, INC., a Florida corporation ("Landlord"), and BEST BUY STORES, L.P., a Virginia limited partnership ("Tenant").

WITNESSETH:

WHEREAS, Landlord and Tenant have entered into a Lease (the "Lease") dated as of June 6, 2007, the terms, provisions and conditions of which are incorporated herein by reference to the same extent as if recited in their entirety herein, whereby Landlord has leased to Tenant the premises (the "Premises") located in Suniland Plaza, 11941 South Dixie Highway, Pinecrest, Florida, said Premises being more particularly described on Exhibit A attached hereto.

Special reference is hereby made to the following terms and provisions of the Lease:

1.     **Term; Option to Extend**. The term of the Lease (the "Lease Term") shall be for a period of fifteen (15) "Lease Years," as that term is defined in the Lease.  The term shall commence on the date (the "Commencement Date") which is the earlier of (i) the one hundred eightieth (180) day after the "Possession Date," as that term is defined in the Lease, or (ii) the date Tenant opens for business to the public at the Premises.  The term shall expire on the last day of the fifteenth (15th) consecutive "Lease Year," unless sooner terminated or extended as provided in the Lease.

Tenant is given the right to extend the Lease Term for four (4) additional periods of five (5) years per period, upon the same terms and conditions as provided in the original term of the Lease.

2.     **Right of Protest**.  Notwithstanding any provision of the Lease to the contrary, in accordance with Florida Statutes Section 713.10, Tenant shall never, under any circumstances, have the power to subject the interest of the Landlord in the Premises to any mechanics' or

(2497)
MP2 15364417.2

1



EXHIBIT
2

(o)

materialmen's liens of any kind.  Neither Tenant nor anyone claiming by, through or under Tenant, including, but not limited to, contractors, subcontractors, materialmen, mechanics and laborers, shall have any right to file or place any mechanics' or materialmen's liens of any kind whatsoever, any such liens are specifically prohibited.  All parties with whom Tenant may deal shall be put on notice, by the recordation of the memorandum of the Lease, that Tenant has no power to subject the Landlord's interest in the Premises to any mechanics' or materialmen's lien of any kind or character, and all such persons so dealing with Tenant must look solely to the credit of Tenant, and not to Landlord's interest or assets.

3.      **Tenant's Trade Fixtures and Signs.**  Landlord shall permit Tenant to construct, in accordance with applicable law Tenant's Plans attached to the Lease as Exhibit D, Tenant's standard storefront structure, including building design and height, for Tenant's installation, at Tenant's sole cost and expense, of Tenant's standard yellow-and-black ticket sign tilted five (5) degrees, with dimensions not less than 25'3" x 15'6" thereon.  Tenant may also install and maintain in the Building such pipes, conduits and ventilating ducts as are required or desirable for Tenant's business.  Tenant shall at all times have the right to remove all signs, trade fixtures, machinery, equipment, or other personal property heretofore or hereafter furnished or installed by Tenant, provided it repairs any damage caused thereby, it being expressly understood and agreed by the parties that such property shall not become part of the Building but shall at all times be and remain the property of Tenant and as such shall not be subject to any landlord's lien or other claim of Landlord.

Tenant shall obtain any municipal and/or city approvals necessary for Tenant's signage as described in the Lease.  Landlord, at its sole cost and expense, shall grant to Tenant all space on any pylon, free-standing, and/or monument signs formerly occupied by Azhars Oriental Rugs for Tenants' installation of its standard pylon sign panel with Tenant's standard yellow-and-black tilted ticket as depicted on Exhibit D attached to the Lease.  In addition, Tenant, at its expense and in accordance with applicable law, may construct such other monument and/or pylon signs in the Common Area of the Premises in a place to be designated by Tenant for Tenant's sole and exclusive use.

Tenant at its expense may place on the interior and exterior of the Building any signs, machinery and other mechanical equipment which conform to applicable legal requirements.  Tenant shall have the right, at its sole cost and expense and in accordance with applicable law, to install its standard prototype signage on the sides and rear of the Building as depicted in Exhibit D of the Lease.

Tenant shall have the right in accordance with applicable law to designate the colors and design for all of its signs on or for the Premises, including panels on any pylon or freestanding sign(s) to which Tenant is allowed space or Tenant's storefront signage and structure.

Landlord shall have no right to place or maintain any signs of any type, other than those of Tenant, on the Premises, including the exterior walls and roof thereof.

4.      **Alterations to Premises.**  Except for changes required by law or by the REA, Landlord will not place or permit to be placed by any person or entity other than Tenant any

2

building, wall, landscaping, fence or other improvement or make any other alterations or changes to the Premises, other than improvements shown as existing or planned on the Site Plan attached to the Lease as <u>Exhibit B</u>, without Tenant's prior written approval, which approval shall be granted, withheld or conditioned in Tenant's sole and absolute discretion. Landlord will not permit the Common Areas to be used in violation of the REA.

5.      **Parking.**   On the Possession Date, the Landlord shall deliver position of the Premises to Tenant with the parking areas and driveways located on the Premises in its "As Is" configuration and condition existing as of the date of the Lease. Except for changes required by applicable law or by the REA, Landlord covenants and agrees that it will not alter or change the configuration of the parking areas or driveways located on the Premises without Tenant's prior written consent, which consent may be withheld in Tenant's sole and absolute discretion.

6.      **Termination.**   Upon the expiration or sooner termination of the Lease, at the request of either party, Landlord and Tenant shall enter into and record a memorandum evidencing such termination in a form reasonably satisfactory to both parties.

This Memorandum is executed for the purpose of recordation in the Official Records of Miami-Dade County, Florida, in order to give notice of the terms and provisions of the Lease and is not intended and shall not be construed to define, limit or modify the Lease. In the event of a conflict between the terms hereof and the terms of the Lease, the terms of the Lease shall control. This Memorandum may be executed in counterpart.

[SIGNATURES ON FOLLOWING PAGE.]

(2497)
MP2 15364417.2

EXECUTED on the date first recited above.

Signed, sealed and delivered
in the presence of:

_Carmen Fanego_
Witness
Carmen Fanego
Print name

_Thos J Matkov_
Witness
Thomas J. Matkov
Print name

**LANDLORD:**

**MARIA INVESTMENTS, INC.,**
a Florida corporation

By: _____
Name: Azhar Said
Title: President

Date: 5/7/08

**TENANT:**

**BEST BUY STORES, L.P.,**
a Virginia limited partnership

Signed, sealed and delivered
in the presence of:

_____
Witness
Jon L. Wallerick
Print name

_Kimberly Barber_
Witness
Kimberly Barber
Print name

By:   BBC  Property  Co.,,  a  Minnesota
corporation, its general partner

By: _____
Name: Alan Wimmer
Title: Sr. Corporate Counsel

Date: 5/6/08

STATE OF _Florida_ )
COUNTY OF _Miami-Dade_ ) ss.

On _May 7_, 2008 before me, _Milagros Curiel_, a Notary Public in and for said State, personally appeared _Aznar Said_, the _President_ of _Mipria Investments_ a _Florida Corporation_ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public
My Commission Expires: _____

STATE OF MINNESOTA )
                     ) ss
COUNTY OF HENNEPIN   )

On _May 6_, 2008, before me, _Teresa A Gaukel_, a Notary Public in and for said State, personally appeared _Alan Winner_, the _Sr. Corp Counsel_ of BBC PROPERTY CO., a Minnesota corporation, the general partner of BEST BUY STORES, L.P., a Virginia limited partnership, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____
Notary Public
My Commission Expires: _1/31/2010_

TERESA A. GAUKEL
NOTARY PUBLIC - MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2010

(2497)
MP2 153644117.2

5

LAST PAGE

## EXHIBIT "A"

A portion of Lots 20 and 22 and all of Lot 21 of Block 4, of SUNILAND CENTER, FIRST AMENDED PLAT, according to the Plat thereof, as recorded in Plat Book 57, Page 14, of the Public Records of Miami-Dade County, Florida and a portion of the Southwesterly 1000.00 feet of Tract B, of SUNILAND TERRACE, according to the Plat thereof, as recorded in Plat Book 65, Page 26, of the Public Records of Miami-Dade County, Florida, being more particularly described as follows;

Commence at the most Westerly corner of said Lot 22; thence North 24° 52' 55" East along the Northwesterly line of said Lot 22 for 5.00 feet to the Point of Beginning of the parcel herein described; thence from the above established Point of Beginning continue North 24° 52' 55" East along the said Northwesterly line of Lot 22 and along the Northwesterly lines of Lots 21 and 20 for 120.00 feet; thence South 65° 07' 05" East along a line that is 25.00 feet Northeasterly of and parallel to the Southwesterly line of said Lot 20 and along the Southwesterly line of the Northwesterly 1000.00 feet of said Tract B for 330.00 feet to a point on the Southeasterly line of said Tract B; thence South 24° 52' 55" West along the said Southeasterly line of Tract B for 200.00 feet; thence North 65° 07' 05" West for 53.17 feet; thence North 24° 52' 55" East for 80.00 feet; thence North 65° 07' 05" West along a line that is 5.00 feet Northeasterly of and parallel to the Southwesterly line of said Lot 22 and its Southeasterly extension for 276.83 feet to the Point of Beginning.